**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IMPALA AFRICAN SAFARIS, LLC, AND** | § | **CASE NO.** |
| **ARNOLD PAYNE** | § | |
| **PLAINTIFFS** | § | **3:13-cv-2175** |
| | § | |
| **VS.** | § | |
| | § | |
| **DALLAS SAFARI CLUB, INC.,** | § | |
| **JEROME PHILLIPE FREDERIC LUNG,** | § | |
| **AFRICA HUNTING, LLC,** | § | |
| **MICHAEL ARTHUR BURKE,** | § | |
| **ERIC ALAN HANSHEW,** | § | |
| **JANE GAYNELLE PIETRANGELO,** | § | |
| **MARTIN PIETERS,** | § | |
| **CANDY PIETERS,** | § | |
| **GENE CAMPBELL,** | § | |
| **WILLIAM LARRY SHORES, AND** | § | |
| **JOHN DOES 1 – 10** | § | |
| **DEFENDANTS** | § | |

**COMPLAINT FOR RESTRAINT OF TRADE, UNFAIR BUSINESS PRACTICES, CIVIL RIGHTS, TORTIOUS INTERFERENCE, DISPARAGEMENT**

TO THE HONORABLE JUDGE OF THE COURT:

Plaintiffs, Arnold Payne ("Payne") and Impala African Safaris, LLC ("Impala African Safaris"),by Dan Krocker, their attorney, complaining of Defendants, allege as follows:

PARTIES

1.  Defendant, Dallas Safari Club, Inc. ("Dallas Safari Club") may be served by and through its Registered Agent/President, Ben Carter at its business address at 13709 Gamma Road, Dallas, Texas 75244, (972) 980-9800.

2.   Defendant, Jerome Phillipe Frederic Lung ("Lung") aka Jerome Phillipe, individually may be served at either his residential address at 3419 E. Chapman Ave, Unit 313, Orange, California 92869-3812, telephone 714-470-1102,  or his place of employment at 277 Tustin Field Dr., Tustin, California 92782-6523.

3.  Defendant, Africa Hunting, LLC ("Africa Hunting") may be served by and through its Principals, Jerome Phillipe Frederic Lung or Janeen Lung at its business address at 277 Tustin Field Dr., Tustin, California 92782-6523, telephone (714) 470-1102.

4.   Defendant, Michael Arthur Burke ("Burke") may be served at his residential address at 4916 Rip Van Wrinkle Road, New Iberia, Louisiana 70560, (337) 365-0254, (337) 288-0485.

5.   Defendant, Eric Alan Hanshew ("Hanshew") may be served at his residential address at 7460 E. Quill Lane, Scottsdale, Arizona 85255-4607, (480) 585-4460.

6.   Defendant, Jane Gaynelle Pietrangelo ("Pietrangelo") may be served at her residential address at 3690 Whetstone Way, Mead, Colorado 80542-4534.

7.  Defendant, Martin Pieters may be served at either his residential address at 77 Circular Drive Road, Burnside Bulawayo, Zimbabwe, or his mailing address of P.O. Box 1684, Bulawayo, Zimbabwe, email martin@bulembisafaras.co.zw.

8.  Defendant, Candy Pieters individually may be served at either her residential address at 77 Circular Drive Road, Burnside Bulawayo, Zimbabwe, or her mailing address of P.O. Box 1684, Bulawayo, Zimbabwe, email martin@bulembisafaras.co.zw.

9.  Defendant, Gene Campbell ("Campbell") may be served at his residential address at 740 North Amelia Ave, San Dimas, California 91773, (909) 394-4859, (909) 917-2281.

10.  Defendant, William Larry Shores ("Shores") may be served at either his business address at Shores, Tagman, Butler & Company, 17 South Magnolia Ave., Orlando, Florida 32801, (407) 872-0744 or his residential address, 3334 Horseshoe Bend Ct, Longwood, Florida 32779-3135, (407) 444-5634.

11.  Plaintiffs will identify John Does 1-10 and John Does Inc. 1 – 10 as discovery has

progressed.

## JURISDICTION

12.  This court has jurisdiction of this cause under the provisions of the Sherman and Clayton Acts, specifically 15 U.S.C.A. §§1, 2 and 15.

## FACTUAL BACKGROUND

13.  Plaintiffs, Arnold Payne, an individual residing and doing business in Arizona and  Impala African Safaris, LLC, a corporation organized under the laws of Arizona. Arnold Payne, individually and Impala African Safaris at all times mentioned in this complaint, are engaged in the business of arranging safaris hunting and photographic trips to Zimbabwe, Africa.  Plaintiffs are engaged in interstate commerce between the various states and other countries in carrying on its business.  Plaintiffs' clients are from the United States, France, Germany, Spain, Austria, Mexico and Africa.


14.  Plaintiffs developed a large, lucrative and profitable business   But for the acts and facts alleged in this complaint, Plaintiffs would have continued to enjoy a lucrative and profitable business and increased their profits and prospered accordingly.


15.  Defendant, Dallas Safari Club is a non-profit corporation organized under the laws of the State of Texas, having its principal office within this district.  From the

time of its organization, the membership of the defendant association has consisted of individuals, firms and corporations engaged in the hunting, photography, conservation, wildlife enthusiasts, safari business, conservation, wildlife enthusiasts and interests, and its members who are named defendants in this case have begun a campaign and conspiracy to restrain, disparage, slander and libel the Plaintiffs and their hunting and photography African safari business. Defendants, Lung, Burke, Pietrangelo, the Pieters, and Shores are members of the Dallas Safari Club. Hanshew and Campbell communicate with Dallas Safari Club and Dallas Safari Club members.

16. Each of the Defendants, Lung, individually and his corporation, Africa Hunting, LLC, and the Pieters are proprietors or employees of competing African safari businesses. These individuals are engaged in the business of offering hunting and photography African safaris. For instance, Shores' booking agent is very close friends with another Zimbabwean rival outfitter, Buzz Charlton. Plaintiffs are therefore a competitor and as a result getting rid of Plaintiffs' business drawing clients to Defendants' businesses such as Shores' agent and rival Zimbabwean outfitters.

17. All of the Defendants violated the provisions of the Sherman Act, 15 U.S.C.A. §§ 1 et seq., and the Clayton Act, 15 U.S.C.A. § 15, in that they are engaged in a

combination and conspiracy to place unlawful restraints on the trade and commerce in offering hunting and photography Zimbabwean African safaris between several states and territories of the United States.

18.  Defendants collectively made false statements in public, in correspondence, email, by telephone, blogs and on the Internet pertaining to the Plaintiffs and their business. Such false statements include but are not limited to allegations of:

- "Booking unethical and illegal hunts at Savuli"

- "Shady characters"

- "in with some of the Zim ministers that seized the property in the Save (Save Valley Conservancy) plus some other bad characters"

- "selling hunts for some that are on the banned list"

- "Advertising a quota of 5 lions on Savuli.  Savuli has only 14,000 acres."

- "Has been sued and lost repeatedly"

- "Bad for hunting, bad for Zim (Zimbabwe) and bad for SCI"

- Plaintiffs have been accused of evicting people at gunpoint

- Plaintiffs have been accused of illegal land invasions

- "Shuvai Mahofa has taken over the Savuli Ranch in the Save

Valley Conservancy.  She claims that she has a legal lease on the property issued by the department of National Parks (who are not entitled to issue leases on Conservancy Properties), however the High Court of Zimbabwe has ruled, in a number of decisions that the legal owners and operators of Savuli, namely Forever African Safaris, should continue operations on Savuli and that their operations should not be interfered with.  In contempt of these High Court decisions, Mahofa has evicted Forever African and its employees, trashed their belongings and thrown their furniture out on the road.  In the meantime, Mr. Ken Drummond has moved onto the property and is operating as Impala Safaris on the Property.  They are operating on a quota issued to Mahofa which has 5 lions on it.  This in itself is farcical as this is more than the entire Save Conservancy quota and Savuli forms a tiny part of this. The issue of the quota itself is also in contempt of a High Court determination that names Forever African as the rightful operator. Given that National Parks are withholding quotas from white operators in the Save, the handing of ridiculously high quota to an illegal operator is inexplicable and smacks of a complete

disrespect for the rule of law from the upper echelons of Parks and indeed the Ministry itself."

- "It has long been suspected that Drummond has paid Mahofa to act in his interest and secure a ranch in the Save Valley, however the fact that he is now posting pictures of the Savuli camp and several impressive trophies on the website of Impala Safaris . . .which is owned and run by one Arnold Payne."

- "Arnold Payne, Ken Drummond, Tikki Drummond, Impala Safaris and any agent thereof is acting completely and utterly illegally with respect to any and all of their actions on Savuli and within the Save Conservancy.  This is not a legal opinion, it is the Opinion of the High Court of Zimbabwe as set down in their recent judgment."

19   The Defendants have implemented several techniques to circulate their false statements.  Such activities include:

- Designing and marking key words in their websites to obtain priority search results on various Internet search engines such as Google when someone types in Plaintiff's names to headline their disparaging statements.

- Possibly hacking into Plaintiffs' email accounts and circulating emails to Plaintiff's customers.

- Posting disparaging remarks on various blogs to circulate the false information.

- False statements have been posted on hunting forums such as www.Africahunting.com, www.AccurateReloading.com and www.24HourCampfire.com.

- Circulated false statements through email lists to various hunt magazines such as "Sports Afield" and hunt organizations such as the Dallas Safari Club, Houston Safari Club and SCI.

- Defendants have sent false statements directly to Plaintiffs' clients from what appear to be hacking into Plaintiffs' confidential, trade secret email lists of clients and business prospects.

- Posted false statements on the Facebook page of the Dallas Safari Club.

- Made false statements on certain radio stations in Southern Africa (SW Radio).

- False statements from members of the Zimbabwe Professional Hunters and guides association telling potential hunters not to

hunt with Plaintiffs.

- At trade shows Plaintiffs have been advised by their own clients that hunters who have hunted with other Zimbabwe hunt companies have verbally told Plaintiffs' hunters not to hunt with Plaintiffs.

- Through business websites operated by Defendants such as Eric Hanshew which operates Western Expedition, and they post on such websites as africahunting.com and Linkedin.

## ANTITRUST VIOLATION - RESTRAINT OF TRADE

20.  The Defendants are engaged in illegal restraint of trade through the Zimbabwe Professional Hunters Association, and or at their direction, this restraint of trade is directed both commercially against Arnold Payne and his business Impala Safaris and is based on prohibited illegal race discrimination. The long history of white racism and suppression of the 99% majority population in the former Rhodesia is a matter of public record. The dark under belly of continuing "white only" repression is rarely publicized, particularly in the hunting community.


21.   The combination and conspiracy complained of have been in continuance existence since the summer of 2012 and have been participated in for varying periods

and varying degrees by each of the Defendants, and also by a large number of individuals not named as Defendants.  The initial step in furtherance of the conspiracy was organized attempt to prevent Plaintiffs from participating in trade shows and renting booths for the businesses.  Such activities and various measures were adopted by the Dallas Safari Club, Inc. as ratified by the officers, directors and members of the association, in furtherance of the combination and conspiracy alleged.

22.   The business purpose of the Defendants' collaboration has already caused anticompetitive concerns. The Defendants' collaboration has decreased Plaintiffs' market share of the hunting and photography trips in designated areas in Zimbabwe since several trade shows have excluded Plaintiffs.   The efforts were a concerted denial which is analogous to boycott, "blackball systems" to restrict access to trade show booths.

23.   Although the Dallas Safari Club membership requirements must therefore be reasonably necessary to accomplish the legitimate goals of the Association, it may not exclude or discriminate against potential members on the basis of criteria unrelated to the potential member's ability to further the objectives of the Association.  In this case, Plaintiffs are being excluded based upon race and false statements pertaining to

their background, history, experience and business.    Since Plaintiffs can not find alternative trade shows to exhibit their services, then the Sherman Act mandates access.

24.  Arnold Payne's business activities in Zimbabwe have been based on fair access to, and rewards from, the Wildlife and Tourism sectors. He has engaged the use of indigenous Black professional hunters, he has offered his knowledge to Black indigenous land owners which include Tribal trust lands/ communal hunt areas and Rural district councils.  Plaintiffs promote sustainable utilization of Wildlife in the hands of these black indigenous populations.

25.  With time, management of Wildlife populations and the benefits thereof have passed more and more into the hands of the black indigenous people of Zimbabwe in the concessions listed above. Some stakeholders in these industries see this and Arnold Payne as a threat as he proudly supports all conservation efforts including those indigenous efforts to conserve wildlife.  It is against this background that the Defendants have attempted to use race as a means to exclude Arnold Payne from doing business in Zimbabwe and exclude him from trade shows including the Dallas Safari Club

26.  Access problems are most clearly presented in this situation where denial of access to Plaintiffs will result in a competitive disadvantage.  Such access problems are violations of  both Section 1 and Section 2 of the Sherman Act. Section 1 of the Sherman Act which forbids all forms of agreement in unreasonable restraint of trade. Section 2 of the Sherman Act forbids monopolization, attempts to monopolize, and conspiracy to monopolize. [1]

27.  Therefore, the Defendants' participation in the Dallas Safari Club, Inc. and their individual activities amount to an antitrust violation which restricts Plaintiffs from trade shows sponsored by not only the Dallas Safari Club but other hunting clubs which share information with the club and members.  Moreover, the Dallas Safari Club has violated the antitrust laws since it has made the decisions to exclude the Plaintiffs from trade shows.  Such behavior is extraordinary in light of the numerous prosecutions of trade associations for violations of the antitrust laws.

## CIVIL RIGHTS VIOLATION

28.  Furthermore, the Dallas Safari Club and the other Defendants have violated Title II of the Civil Rights Act of 1964 prohibits certain forms of discrimination in private

---

[1]  The antitrust laws – the Sherman Act, Clayton Act and Federal Trade Commission Act at the federal level, and similar laws in many states – prohibit contracts, combinations, conspiracies, and other agreements in restraint of trade, as well as monopolization and attempted monopolization.  An unlawful agreement or conspiracy can exist without any writing.  An agreement may be oral or written, formal or informal, express or implied.  Casual conversations or "off the record" remarks can provide the basis for an antitrust claim.  15 USC section 1.

associations or organizations.    Because the issue of discrimination in private clubs rarely involves protected property or contract rights or any state action,  the public accommodations law of Title II of the Civil Rights Act of 1964 provides a remedy to victims of discrimination by prohibiting discrimination or segregation on the basis of race, religion, color, or national origin at places of "public accommodation" that affect commerce. [2]

29.    Plaintiffs conduct legal hunts on the privately run Bubiana Conservancy, Government Sijarira Forestry Concession, Tribal Community concessions in the Zambezi Valley along Lake Kariba and other hunting concessions based on legal quotas.  In this case, the Defendants have attempted to use race as a means to exclude Arnold Payne from doing business in Zimbabwe and exclude him from trade shows with  the  Dallas  Safari  Club.    By  its  statutory  definition,  a  private  club  is discriminatory if its membership is inherently selective.  One of the primary reasons Arnold Payne is being targeted in a "turf war" which is vicious among Zimbabwean

---

[2]  See 42 U.S.C. § 2000a(a) (1994) ("All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, . . . without discrimination or segregation on the ground of race, . . . ."). On its face, Title II is limited in scope because it prohibits only discrimination by private individuals providing public accommodations that affect commerce *Daniel v. Paul,* 395 U.S. 298, 302 (1969).  Congress enacted Title II of the Civil Rights Act of 1964 to eradicate racial prejudice and discrimination by private individuals in places of public accommodation.  See 42 U.S.C. § 2000a (1994).

outfitters is because Arnold Payne is the sole "colored Zimbabwean" agent, outfitter, representative at any hunting show.   This does not sit well and is virtually unacceptable with all Zimbabwean rival outfitters.

30.   Within the Zimbabwe Professional Hunters Association, there is less than 5% Black Indigenous membership among professional hunters.   Not a single Black Indigenous Professional Hunter/Outfitter has a booth at the Dallas Safari Club. Zimbabwe has a 99% Black Indigenous population.   [3]

31.   The above mentioned false statements made by the Defendants pertaining to the Plaintiffs and Plaintiffs' business amount to deception.   Deception means "knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact." [4]   It includes knowingly withholding "facts basic to a transaction." [5]   Consequently, deception requires two important deviations from the competitive ideal: (1) falsity is not quickly exposed in the marketplace of ideas, and

---

[3]   Title II provides an important remedy to many victims of discrimination as a result of a club's exclusionary practices by broadly defining public accommodation.   See 42 U.S.C. § 2000a(b).

[4]   Black's Law Dictionary 406 (6th ed. 1990)

[5]   Restatement (Second) of Torts § 551(2)(e) (1977).

(2) competition itself cannot work effectively.  Market participants do not act with full and perfect knowledge (either buyers or sellers know less than their counterpart) and enter suboptimal transactions (or forgo transactions altogether).   Deception's anticompetitive effects include the following:

- raising the search costs for consumers in choosing products; [6]

- leaving consumers who purchased the wrong or inferior product worse off;

- increasing the transaction costs for honest sellers to differentiate their products and to reap the financial, reputation-related rewards associated with their desirable products; [7]

- raising rivals' costs (in having to respond to a competitor's deceptive statements);

- creating market distortions and causing a deadweight welfare loss as consumers forgo or minimize purchases;

- tipping sales to the deceptive firm, which in markets with network

---

[6] see, e.g., Gwendolyn Bounds, What Do Labels Really Tell You? As Eco-Seals Proliferate So Do Doubts, Wall St. J., Apr. 2, 2009, at D1. This effect of deception was a concern when a competitor palmed off its goods as that of its competitors. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 160-66 (1995); see also Restatement (Third) of Unfair Competition § 2 cmt. a (1995) ("As confidence in the truth of advertising diminishes, prospective purchasers may be forced to expend additional resources ... .").

[7] See, e.g., Qualitex, 514 U.S. at 164

effects [8] can lead to the exercise of monopoly power; [9]

- increasing entry barriers for new products (whose qualities and risks cannot be quickly assessed);

- preventing some markets or services (such as standard setting) from developing;  and

- creating "lemon" markets where dishonest dealers for goods or services drive out honest dealers, [10] thereby inhibiting innovation in these markets.

32.  As a result of the conspiracy alleged, the power and influence of the Dallas Safari Club and the individual Defendants pertaining to the trade shows have been greatly

---

[8]  Marina Lao, Networks, Access, and "Essential Facilities": From Terminal Railroad to Microsoft, 62 SMU L. Rev. 557, 560-61 (2009) ("The defining characteristic of network industries is the increasing value of their products to users as the number of users increases, a phenomenon called 'network effects' or demand-side economies of scale"; the increased value can come directly (having more interconnections as a result of more users (e.g., telephones)) or indirectly (having more supporting complements developed for that product as the number of users increases (e.g., Windows operating system))); see also *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 20 (D.D.C. 1999) (discussing the "positive network effect" of Windows; Case T-201/04, *Microsoft Corp. v. Comm'n*, 2007 E.C.R. II-3601 (discussing the indirect network effects of streaming media players).

[9]  See, e.g., *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313-14 (3d Cir. 2007) (discussing network effects for deception in standard-setting process).

[10]  *FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922) ("The honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument, which enables the retailer to increase his own sales of the dishonest goods, thereby lessening the market for the honest product."); George A. Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, 84 Q.J. Econ. 488, 495 (1970) (noting that the cost of dishonesty includes "loss incurred from driving legitimate business out of existence").

increased, its membership has grown, and the ongoing hunting and photography African safaris arranged by the Plaintiffs' have decreased.  As a further and direct result of this combination and conspiracy, trade shows, interstate trade and commerce in the hunting and photography African safaris industry is restrained and prevented in such a manner and to such an extent that Plaintiffs' business has substantially been affected and decreased.

33.  The acts on the part of Defendants were in restraint of trade and did constitute a monopoly and were and are an attempt to monopolize, and by reason of the various prohibitions to rent trade show booths, advertise in trade association materials, disparaging remarks, libel, and slander, Plaintiffs were restricted in their trade and competition, and because of such inability to compete in the market during the period mentioned, by reason of the preceding, they have been damaged in that their business is less profitable and demand for services have drastically diminished, and the Plaintiffs have lost approximately $170,000.00  monthly.

## BUSINESS DISPARAGEMENT

34.  Defendants published disparaging written and oral statements about Plaintiffs' business in which they allege "unethical and illegal hunts at Savuli" as described above.

35.   The statements were false because Plaintiffs are not involved in the illegal acquisition of land in the Save Conservancy and do not conduct unethical or illegal hunts.

36.  Defendants published the statement with malice in an attempt to prevent Plaintiffs access to trade shows and decrease their business activity and increase the business activity of a select group of competitors, Defendants as described above.  Defendants published the statement without privilege.

37.  Defendants' false statements caused injury to Plaintiffs, which resulted in the following special damages: actual damages from the loss of monthly income as previously stated, loss of business, loss of credit, expense counteracting publication, exemplary damages and legal fees.   Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

## DEFAMATION

38.   In addition to other counts, Defendants defamed Plaintiffs. The Defendants published statements on their websites, correspondence, email and blogs falsely alleging that Plaintiffs are involved in the illegal acquisition of land in the Save

Conservancy and conduct unethical or illegal hunts. The statements are false, defamatory and made with malice as outlined in the preceding paragraphs. With regard to the truth of the statement, the Defendants were acting with actual malice. The Plaintiffs suffered pecuniary injury.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

39.  Plaintiffs were prepared to enter into contracts with various hunting associations such as the Dallas Safari Club, Inc. when one by one various associations accepted the false information and barred Plaintiffs from the trade shows, restraining their business. As a result of the activity, Plaintiffs are losing monthly revenue of $170,000.00.


40.  Plaintiffs have an ongoing business relationship with a number of hunting clubs and associations which facilitated participating in trade shows to attract customers. Being black listed on false information pertaining to race, and allegations of unethical and illegal hunts struck Plaintiffs' bottom line. Defendants' actions were intentional since many of them were competitors who compete for customers at trade shows. By excluding Plaintiffs from the hunting clubs and associations and their sponsored trade shows, the Defendants were cutting quickly and effectively into Plaintiffs' client base. The Defendants' conduct was independently tortious and unlawful under the restraint of trade laws and civil rights laws. The Plaintiffs can recover for tortious interference

from the Defendants who made fraudulent statements about the Plaintiffs to third parties and the illegal boycott prohibiting Plaintiffs from hunting clubs and associations and their sponsored trade shows.. [11]

41.  Defendants knew of Plaintiffs' prospective clients from the various hunting clubs and associations and their sponsored trade shows with existing clients and prospective clients and intentionally interfered with them.

42.  Defendants' illegal boycott and use of false information to keep Plaintiffs out of hunting clubs and associations and their sponsored trade shows were independently tortious and unlawful, regardless of the effect those actions had on plaintiff's prospective contract and business relationships with both current customers and prospective customers from trade shows.  Plaintiffs suffered actual damages because Defendants' interference prevented Plaintiffs from entering into the prospective contracts and or continuing Plaintiffs' business relationship with current clients and prospective clients from various hunting clubs and associations and their sponsored trade shows.

---

[11]   The Plaintiffs do not have to prove the Defendants' conduct was not justified or privileged  *Wal-Mart Stores v. Surges*, 52 S.W.3d 711, 726 (Tex.2001).

43.  Defendants' interference proximately caused injury to Plaintiffs, which resulted in the following damages: lost earnings, mental anguish, injury to reputation, exemplary damages, lost benefits of contracts with prospective clients and hunting clubs and associations and their sponsored trade shows.

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

44.  In addition to other counts, Defendants interfered with Plaintiffs' contracts with current clients who had already signed on for hunting or photography trips and with contracts with hunting clubs and associations and their sponsored trade shows.  Many of the already agreed to trade show engagements were cancelled and deposits returned causing a substantial loss in business, reputation and revenue.  To have the rug pulled out on long standing relationships with hunting clubs and associations and their sponsored trade shows was heart breaking.

## MENTAL ANGUISH

45.  In addition to other counts, Defendants intentionally caused Payne emotional distress and mental anguish.  The business disparagement, restraint of trade and violations of civil rights have caused Arnold Payne suffer emotional distress and mental anguish in attempting to salvage bookings, locate alternative marketing procedures for the lost trade shows, respond to emails, investigations, telephone calls addressing the false accusations  while minimizing the effects on both the business

and family life and peace of mind.  The Defendants actions were hateful, intentional, deliberate, reckless and made with malice.  If the Defendants wanted to put competitive pressure on Plaintiffs, they could have spent more time and money on marketing without resorting to making outrageous false statements.  The more outrageous the statements the more inciteful they have been in spreading through more innocent people who re-urge the false statements without any of their usual careful investigation.

46.  In addition  to the other counts, Defendants intentionally caused Arthur Payne emotional distress and mental anguish.  Defendant's conduct in disseminating false information alleging unethical, illegal hunting activities was intentional and reckless in an attempt to restrain Plaintiff's business. The Defendants desired to cause a loss in business and a loss in reputation to humiliate Arnold Payne.  The Defendants knew or had reason to know the high degree of harm and deliberately proceeded to act in conscious disregard limiting Plaintiffs' access to trade shows.  Arnold Payne's emotional distress was severe which included painful emotional and mental reactions, such as embarrassment, fright, horror, grief, shame, humiliation, and worry.  Arnold Payne's reaction to this stress caused nausea, stomach disorders, headaches, difficulty sleeping and eating, stress, anxiety and depression.  Defendants' conduct was

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. [12] Defendant's conduct in spreading false information alleging unethical and illegal hunts was intentional and reckless. Defendants acted knowingly when they published the information without any investigation in an attempt to take his business by damaging his reputation. Defendants' conduct proximately caused severe emotional distress and mental anguish to plaintiff.

47. Defendants' false information spread like wild fire on the Internet and they kept the false statements alive by adding to them periodically to make sure Plaintiffs would be excluded from more hunting associations and trade shows. This ongoing conspiracy and continuous flow of new information in new media fueled the fire. This situation is similar to the case between Carol Burnett and the National Enquirer in which Carol Burnett testified:

> "It is disgusting, and it is a pack of lies. I---it hurts. It hurts, because words, once they are printed, they've got a life of their own. Words, once spoken, have a life of their own. How was I going to explain to my kids, my family,

---

[12] *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003).

the people I care about?"

48.  Plaintiff's severe emotional distress and mental anguish cannot be remedied by any other cause of action since the Defendants inflicted severe emotional distress in a manner so unusual that Arnold Payne has no other recognized means of redress. The ongoing assault of a conspiracy campaign of false statements across an elaborate mixture of media from websites, blogs, email, etc. never let up and kept feeding itself daily with new racists overtones and allegations of unethical, illegal behavior which affected Payne's family life, business life and peace of mind.

49.  Defendants' wrongful conduct caused the following damages: mental anguish, loss of society, medical expenses, lost earning capacity, past and future pain and suffering, and exemplary damages.

50.  Defendants' conduct proximately caused severe emotional distress to plaintiff. Because the intended consequences or the primary risk of the Defendants' conduct is emotional distress, proof of the Defendants' conduct should be sufficient to prove the foreseeability element of proximate cause. [13]

---

[13]  *Seminole Pipeline Co. v. Broad Leaf Partners*, 979 S.W.2d 730, 755-56 (Tex.App.-Houston [14th Dist.] 1998, no pet.

**EXEMPLARY DAMAGES**.

51.  Plaintiff's injury resulted from defendant's malice, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).  The Defendants' malice and intent was to steer Plaintiffs' business to competitors tied to a select group of Defendants.

**INJUNCTIVE RELIEF**

52.  Plaintiffs seek injunctive relief.  Injunctive relief is proper when restraining the publication of a defamatory statement that is essential to protect a business or other property interest threatened by intimidation or coercion. [14] Furthermore, injunctive relief is appropriate for the claims under the sections on restraint on trade, violations of civil rights, and unfair business practices and the destruction of evidence pertaining to the ongoing conspiracy to disseminate false statements alleging illegal and unethical hunts . *

53.  Defendants published  statements by both oral communication and written communication by posting information on websites, blogs, emails and correspondence asserting as fact that Plaintiffs are involved in the illegal acquisition of land in the Save Conservancy and conduct unethical or illegal hunts. All of the Defendants are

---

[14]  *Ex parte Tucker*, 220 S.W. 75, 76 (Tex.1920)

nonmedia defendants who intentionally published the statements to third persons in an attempt to restrain Plaintiffs' business and prevent them from participating in trade shows.  Furthermore, such statements by the Defendants continued the spread of false information as it was disseminated through the Internet by third parties who did not take time to investigate the facts which were objectively verifiable through the various proper authorities pertaining to registration, court rulings and license requirements in various hunting jurisdictions which are public information.  This action by third parties was foreseeable in light of the viciousness and explicitness of the false information.  Such allegations are so unusual, that like the worst gossip, it spreads quickly.  Defendants' statements involved a private issue pertaining to Arnold Payne's race, civil rights, licenses, permits and registration of conducting business in certain jurisdictions. Defendant's statement referred to Arnold Payne by name as mentioned earlier in the pleadings pertaining to the nature of the false statements.


54.  Defendants' statements were defamatory because they expose Arnold Payne to public hatred, contempt, ridicule, financial injury, impeaches his honesty, integrity, virtue and reputation in publishing false statements that he was personally involved in the illegal acquisition of land in the Save Conservancy and conduct unethical or illegal hunts.

55.   Defendants' written statements were libel per se as defined by Texas Civil Practice & Remedies Code section 73.001. Defendants' statement

(A)    injured Arnold Payne's reputation and exposed him to public hatred, contempt, ridicule, or financial injury by falsely stating that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

(B)    impeached Arnold Payne's honesty, integrity, virtue, or reputation by falsely stating that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

( C )   described plaintiff's natural defects and exposed plaintiff to public hatred, ridicule, or financial injury by misrepresenting Arnold Payne's race and affiliation with various individuals involved in the illegal acquisition of land in the Save Conservancy and/or individuals who conducts unethical or illegal hunts.

56.  Defendants' oral and written statements were defamatory per se under the common law.   Defendants' statement

(A)    injured plaintiff in plaintiff's hunting and photography safari booking business.  The false allegations that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts restrained his trade and moved ongoing bookings and future bookings to competitor Defendants.

(B)    falsely charged plaintiff with a crime pertaining to false statements that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

57.  Defendants' statement were false because neither Arnold Payne nor his family members were or have ever been involved with any individuals who participated in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

58.  Since Payne is a private plaintiff and the Defendants are nonmedia defendants,

Defendants are strictly liable to plaintiff for the defamation.  Plaintiff does not have to prove the Defendants had knowledge that the statements were false. [15]

59.  Defendants' false statements caused injury to plaintiff, which resulted in the following damages: general damages of compensation for injury to character or reputation, injury to feelings, mental anguish, and similar wrongs and special damages from loss of earning capacity, loss of employment and business opportunity, loss of past and future income.  Payne's mental anguish included a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and public humiliation.

60.  Defendants' false statements were defamatory per se, which entitles Plaintiffs to a presumption of general damages.  Proof that a statement was defamatory per se is considered sufficient evidence to establish some degree of damages, and the jury is permitted to estimate the amount without additional evidence. [16]

61.  Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

---

[15] *Hurlbut v. Gulf Atl. Life Ins.*, 749 S.W.2d 762, 766 (Tex. 1987).

[16] *Bolling v. Baker*, 671 S.W.2d 559, 569-70 (Tex.App.-San Antonio 1984, writ dism'd)

## REQUEST FOR PRELIMINARY INJUNCTION

62. Plaintiffs will likely suffer irreparable injury if Defendants are allowed to destroy their records, emails, correspondence and other evidence of false statements pertaining to the Plaintiffs and if they are not enjoined while this suit is pending from their ongoing conspiracy to disseminate false statements alleging illegal and unethical hunts thereby losing Plaintiffs' ability to participate and be a member in hunting clubs and associations and their sponsored trade shows.  It is not unusual for Defendants in similar situations to destroy records or increase their campaign efforts of disseminating false information in an attempt to prolong litigation and affect Plaintiffs' business. [17]

63.   There is no adequate remedy at law because the destruction of records will prolong the litigation and increase the costs of discovery while an ongoing campaign of destructive false statements will expand the litigation to additional third parties who accept the false information without investigation and re-publish it in a more damaging format. [18]   If we can preserve the Defendants' records, minimize the

_____

[17]  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1379-80 *(Fed. Cir. 2009)*(in an International trade case, the greater the potential harm to the plaintiff, the lesser the burden on Plaintiffs to make the required showing of likelihood of success on the merits)

[18]   *N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984); *Wilson v. Ill. S. Ry. Co.*, 263 U.S. 574, 576-77 (1924); *Winston v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89, 879 F. Supp. 719, 725 (W.D. Ky. 1995)*(The court concluded that an injunction was appropriate in a labor dispute where the parties had arbitrated a dispute, but had not yet received the final arbitration award.  .A theoretical right to recover money damages will not constitute an adequate legal remedy where difficulties in the collection of any judgment

addition to the list of Defendants by stopping the flow of false information, the litigation would be more manageable and minimize the likelihood of filing similar suits against new third party defendants.

64.  There is a substantial likelihood that Plaintiffs will prevail on the merits because they have strong evidence of the outrageous false statements and the intentional acts which drive many of the Defendants to minimize Plaintiffs' business by steering the business to themselves or their contacts or customers. [19]

65.  The harm faced by Plaintiffs outweighs the harm that would be sustained by Defendants if the preliminary injunction were granted.   The restraint of trade has a tremendous impact on Plaintiffs' business, family and peace of mind and collectively spread out over all the Defendants' businesses  may have less impact on them due to the dilution in the numbers of the Defendants.   Plaintiffs were not interfering with the Defendants' businesses. [20]

---

render that remedy illusory).

[19]   *Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975); Bluefield Water Ass'n v. City of Starkville, 577 F.3d 250, 252-53 (5th Cir. 2009); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 417 (4th Cir. 1999)*

[20]   *Coca-Cola Co. v. Purdy, 382 F.3d 774, 789 (8th Cir. 2004)*(the abortion activist registered and used domain names that were identical or confusing similar to the domain owners' marks with a bad faith intent to profit, as defined by the Anti-cybersquatting Consumer Protection Act*.); Winston, 879 F. Supp. at 725*

Original Complaint

66. Issuance of a preliminary injunction would not adversely affect the public interest. In fact the restraint of trade and violations of civil rights would decrease.   The public would be better served when false information does not adversely affect competition in the hunting and photography safari industry.  [21]

67.  Plaintiffs are willing to post a bond in the amount the Court deems appropriate and continue the bond set by the Court for the temporary restraining order.

68.  Plaintiffs asks the Court to set their application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against Defendants.

## REQUEST FOR PERMANENT INJUNCTION

69.  Plaintiffs ask the Court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendants.

---

[21]   Alliance for the Wild Rockies, 632 F.3d at 1135(an environmental group sought a preliminary injunction go enjoin a timber salvage sale); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362-63 (Fed. Cir. 2008)( in a patent pharmaceutical case, the court found that the public interest includes consideration of whether, by shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the attack, the incentive for discovery and development of new products is adversely affected.; *Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001)(*the probable loss of consumer goodwill for plaintiff outweighs the costs of delay of defendant not being able to sell a competing fragrance product which is labeled to confuse the consumer)

**JURY DEMAND**

70.  Plaintiffs demand a jury trial and tenders the appropriate fee with this petition.

**OBJECTION TO MAGISTRATE JUDGE**

71.  Plaintiffs object to a Magistrate judge hearing a trial on the merits or presiding at a jury trial.

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  That the Court adjudge and decree that Defendants engaged in an unlawful contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

2.  That the Court adjudge and decree that each of the Defendants, their subsidiaries, successors, transferees, assigns, and respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from destroying evidence of their communications of false information and directly or indirectly continuing, maintaining their ongoing dissemination of false information on the Plaintiffs pertaining to allegations of illegal and unethical hunts and conspiracy alleged herein, and from

engaging in disseminating such false information in combination or conspiracy, agreement, understanding or concert of action having a similar purpose or effect;

3.    (a)  Actual damages of $170,000 monthly beginning July 2012 through the date of judgment.

(b)  Exemplary damages equal to three times actual damages.

( c )  Prejudgment and post-judgment interest as allowed by statute.

4.  The Plaintiffs recover threefold the damages that each sustained;

5.  That Plaintiffs recover the costs of the suit, including reasonable attorneys' and expert fees and costs; and that the Court grant such other, further or different relief as may be just.

Dated: June 10, 2013.

Respectfully submitted,
/s/ Dan Krocker
Dan Krocker, CPA
Attorney at Law
710 North Post Oak Road, Suite 400
Houston, Texas 77024-3812
(713) 683-0397
Fax (713) 683-0398
TBA 11728300
S.D.I.D. 3230
Attorney for Plaintiffs, Arnold Payne and Impala African Safaris, LLC

STATE OF ARIZONA     §
COUNTY OF MARICOPA    §

Before me, the undersigned notary public, on this day personally appeared Arnold Payne, individually and as principal of Impala African Safaris, LLC, who after being duly sworn, stated under oath, that he is the Plaintiff in this action; that he has read the above and foregoing instrument and that every statement contained therein is within his  personal knowledge and is true and correct.


original signed and notarized and attached as an exhibit
Arnold Payne, individually and as principal of Impala African Safaris, LLC


SUBSCRIBED AND SWORN TO BEFORE ME on the __ day of June, 2013, to certify which witness may hand and official seal.


_____
Notary Public in and for the State of ARIZONA

My commission expires on:_____