**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IMPALA AFRICAN SAFARIS, LLC, AND** | § | **CASE NO.** |
| **ARNOLD PAYNE** | § | |
| **PLAINTIFFS** | § | **3:13-cv-2175-G** |
| | § | |
| **VS.** | § | |
| | § | |
| **DALLAS SAFARI CLUB, INC.,** | § | |
| **JEROME PHILLIPE FREDERIC LUNG,** | § | |
| **AFRICA HUNTING, LLC,** | § | |
| **MICHAEL ARTHUR BURKE,** | § | |
| **ERIC ALAN HANSHEW,** | § | |
| **JANE GAYNELLE PIETRANGELO,** | § | |
| **MARTIN PIETERS,** | § | |
| **CANDY PIETERS,** | § | |
| **GENE CAMPBELL,** | § | |
| **WILLIAM LARRY SHORES, AND** | § | |
| **JOHN DOES 1 – 10** | § | |
| **DEFENDANTS** | § | |

**FIRST AMENDED COMPLAINT FOR DEFAMATION, RESTRAINT OF TRADE,
UNFAIR BUSINESS PRACTICES, VIOLATION OF CIVIL RIGHTS,
TORTIOUS INTERFERENCE OF BUSINESS CONTRACTS, DISPARAGEMENT**

TO THE HONORABLE JUDGE OF THE COURT:

Plaintiffs, Arnold Payne ("Payne") and Impala African Safaris, LLC ("Impala African Safaris"),by

Dan Krocker, their attorney, complaining of Defendants, allege as follows:

PARTIES

1. The Defendants are Dallas Safari Club, Inc. ("DSC"), Jerome Phillipe Frederic Lung ("Lung"),

Africa Hunting LLC ("Africa Hunting"), Michael Arthur Burke ("Burke"), Eric Alan Hanshew

("Hanshew"), Jane Gaynelle Pietrangelo ("Pietrangelo"), Martin Pieters, Candy Pieters (the

"Pieters:), Gene Campbell ("Campbell") and William Larry Shores ("Shores").  The Defendants

have been served.  Plaintiff has filed default judgments on Jerome Phillipe Frederic Lung and his company, Africa Hunting, LLC.

## JURISDICTION

2.  This court has jurisdiction of this cause under the provisions of the Sherman and Clayton Acts, specifically 15 U.S.C.A. §§1, 2 and 15.  Section 15 U. S. C. A.  Section 15 states in part a Plaintiff …may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent".

## FACTUAL BACKGROUND

3.  Plaintiffs are Arnold Payne ("Payne"), an individual residing and doing business in Arizona and Impala African Safaris, LLC ("Impala African Safaris"), a corporation organized under the laws of Arizona.  Plaintiffs are engaged in the business of arranging hunting safari trips to Zimbabwe, Africa.   Plaintiffs are members and have an operator's license with the Zimbabwe Tourism Authority and Plaintiffs work hand in hand and are fully licensed with the Zimbabwe Parks and Wildlife.  Zimbabwe Tourism Authority authorizes all operators by issuing tour operating licenses.  Zimbabwe Parks and Wildlife Management authorizes individuals to conduct hunting tours by issuing them a hunter's license.   Plaintiffs are engaged in interstate commerce between the various states and other countries in carrying on its business.  Plaintiffs' clients are from the United States, France, Germany, Spain, Austria, Mexico and Africa.

4.  Plaintiffs developed a large, lucrative and profitable business.  But for the acts and facts alleged in this amended complaint, Plaintiffs would have continued to enjoy a lucrative and profitable

business and increased their profits and prospered accordingly.

5.   Martin and Cindy Pieters and Jerome Lung actually have booths at Dallas Safari Club, attend religiously. The purposefully avail themselves of the lucrative dominant Texas market and each have numerous Texas clients. They have harmed Plaintiff by direct attacks on this Texas market without taking any steps to easily exclude Texas potential customers from their defamatory attacks.

6.   Each individual Defendant who attends the DSC trade show attends multiple house parties and private functions as well as meeting other Texas residents at hotels and restaurants.

7.   Michael Burke is Martin and Cindy Pieter's agent, proxy and mouthpiece in the US. As such Martin Pieter's booth in the Dallas Safari Club directly benefits Michael Burke and his business website, www.cowislandoutdoors.com . He markets co-defendant and has availed himself of the Texas market likewise. His extensive racism and defamation against Plaintiff was directly targeted towards the dominant Texas market of African safari hunters.

8.   Defendant, Dallas Safari Club ("DSC") is a non-profit corporation organized under the laws of the State of Texas, having its principal office within this district.  From the time of its organization, the membership of DSC has consisted of individuals, firms and corporations engaged in the hunting, photography, conservation, wildlife enthusiasts, safari business, conservation, wildlife enthusiasts and interests, and its members who are named defendants in this case have begun a campaign and conspiracy to restrain, disparage, slander and libel the Plaintiffs and their African hunting African

safari business and have corresponded with board members of DSC in their efforts to perpetuate and disperse the false allegations against the Plaintiffs.   Lung, Burke, Pietrangelo, the Pieters, and Shores are members of the DSC.   Hanshew and Campbell communicate with DSC and DSC members.   DSC relied on false criminal allegations regarding the Plaintiffs when they denied Plaintiffs the opportunity to obtain a booth at their annual convention.

9. Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, DSC and Pieters are either proprietors, agents, proxy or employees of competing African safari businesses in their capacity to market and promote competitors.

10.   Burke markets and promotes for Martin Pieters Safaris through his moderated website cowislandoutdoors.com and various Internet post on hunting forums such as www.africahunting.com and www.accuratereloading.com.   In addition to marketing for the Pieters, Burke is a representative for the Zimbabwe Professional Hunters and Guides Association ("ZPHGA").   Burke is a special guest each year at the ZPHGA Hunter's Ball held in Bulawayo at the end of year.   Burke is then given hunts as a thank you for doing his job of defaming competitors such as Plaintiffs on various Internet forums.   Burke explains in his Internet posts that "he knows more politically about Zimbabwe than most do."   Burke is used as a mouthpiece for the ZPHGA by constantly posting in forums to trample each and every competitor hunting in Zimbabwe by any means possible.   If you are a Black Zimbabwean Professional Hunter, Burke with the blessing of the ZPHGA is quick to find you and disparage your business and good name.   As Pietrangelo and Shores continue to disparage Black Zimbabwean Professional Hunters such as Plaintiffs, they will move up the ranks and be

recognized by the ZPHGA as a special guest and get free hunts. [1]  Lung, Africa Hunting, LLC,

Burke, and Pieters are engaged in the business of offering African hunting safaris.  Burke's mission

statement on his blogs is "support the reputable operators, put the rest out of business."


11. Ben Carter, President of DSC is on a special Safari Club International ("SCI") advisory board.

Ben Carter is working in tandem with Chris Hudson on preventing Plaintiffs from having a booth

at the DSC.  By a letter dated September 26, 2012, Ben Carter  attempted to exclude Plaintiffs from

DSC trade shows with allegations that Plaintiffs had to be members of the Zimbabwe Professional

Hunters and Guides Association ("ZPHGA").  Ben Carter represented to Plaintiffs that the policy

of DSC was that a condition for exhibiting with DSC is to be a member in good standing with either

ZPHGA, Professional Hunters Association of South Africa, or Namibia Professional Hunters

Association, all of which are dominated by white members limiting Black or "Colored" members.

 The word for Southern African "Colored" is a term used in South Africa for individuals of mixed

descent of Black and White, Black and Asian, Black and Chinese, Pakistani, Indian or any Asian.

 The word "Black" is a term of art used in Africa for a native Indigenous  black  person.  Payne is

considered "Colored".   However, countless agents that exhibit at the Dallas Safari Club sell hunts

---

[1]  For instance, Plaintiffs' associate, Wilken Masuku received a problem elephant quota
granted through CITES by the Zimbabwe National Parks in a concession next to a national park.
Elephants pose agricultural damage to crops and money raised goes directly to National Parks for
conservation.  These hunts are legal hunts established by professional ecologists on a
scientifically determined basis.  As these legal hunts for quota given to Wilken Masuku, Founder
of the Zimbabwe Indigenous African Professional Hunters and Guides Association("ZIAPHGA")
were offered for sale through D. K, an agent in the U.S., Martin Pieters conducted a racially
motivated disinformation campaign posting himself and through his agent, Burke that these hunts
were illegal hunts in government parks and those hunting would be prosecuted and the permits
illegally acquired through corruption of the Zimbabwe government.

for multiple outfitters that are not members of any of these associations.  Black members of the

ZPHGA can not attend the annual ZPHGA's Hunters Dinner.  Plaintiffs' associate, Wilken Masuku

is a member of ZPHGA.  Ben Carter continued to come up with reasons for Plaintiffs to be excluded

from exhibiting with DSC in 2013 and finally relented after every false, imaginary requirement by

Carter was met and documented.


12.  Chris Hudson's  attempts to set  Payne up involve him emailing Payne on September 17, 2012

soliciting an illegal hunt in the SAVE Conservancy which Payne obviously did not agree to provide

for Hudson.  Plaintiffs explained to Hudson that the Zimbabwe National Parks Department was

controlling all hunts on the SAVE Valley Conservancy but that Plaintiffs had a very large quota on

buffalo, leopard, elephant, lion, hippo, crocodile, sable and superb plains game and other parts of the

country.   The concessions are land rights i.e. the right to hunt on the land.  The quota allows you to

take a certain amount of animals.  A quota is the fixed amount of a particular product that is

permitted to be sold within a designated time frame.  For example, in Zimbabwe a hunting area may

be given the following by National Parks Department:  2 X Elephant, 5 X buffalo, 2 X hippo, 1 X

lion, 1 X leopard.  The lease holder of the area cannot shoot anymore animals than the animals

assigned in the quota. The quota is only good for that calendar year. A new quota will be assigned

the following season. The bulk of the other outfitters are unable to qualify for quotas and must re-

purchase  from other outfitters who have the quotas causing another layer of costs to the purchaser.

By the time Chris Hudson's attempts at baiting Plaintiff into offering illegal hunts had failed, a

canceled booth was available to Plaintiffs on November 16, 2012.  However, by March 21, 2013,

Ben Carter then attempted to restrict Plaintiffs again without providing any reason but informing

Plaintiffs that the DSC did not have any booths available for Plaintiffs to show at the 2014 convention.  Ben Carter is convinced that at some point Plaintiffs and members of Zimbabwe Indigenous Professional Hunters and Guides Association ("ZIPHGA") will go away.

13.  Chris Hudson, President elect and  DSC board member is the official United States booking agent for a rival Zimbabwean hunting company called "Desfountain and Jones, Ltd. (www.desfountainandjones.com).   Dale Desfountain is an outfitter from Zimbabwe who is also a Board member of the DSC.

14.  Some of DSC's more prominent members, recipients of awards and exhibitors such as Buzz Charlton have been spokespersons for DSC's hidden agenda of favoring certain members or exhibitors and using such spokespersons to disparage Plaintiffs.  Some DSC members and celebrity even contacted two high bidders of Plaintiffs' charity hunts to discourage them from accepting the winning bid on the false allegation that Plaintiffs had seized land illegally and were conducting illegal hunts in Zimbabwe.  One successful bidder backed out of his transaction and the other successful bidder investigated the allegations and determined they were false and took the hunt. Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell feed off of each other and other DSC spokespersons to add to the false allegations.  For instance on May 2, 3013, Shores alleged Plaintiffs sent thugs to intimidate Buzz Charlton into retracting his false allegations against Plaintiffs in posts on www.accuratereloading.com.   Shores concludes his remarks saying Payne "is a major problem.  Good riddance."   Shores is attempting to eliminate Plaintiffs' business in Zimbabwe in order to direct Plaintiffs' clients to rival outfitters and competitor businesses in Zimbabwe with whom Shores spends an excessive amount of money.  In late 2012, the

accuratereloading website frequented by Burke, Shores and Pieters had frequent posts from DSC

members using the N– word frequently when posting about the SAVE valley political situation.

15.  DSC's members and designated celebrities have been contacting Plaintiffs' clients in attempt

to get them to cancel hunts.    In one instance, the hunter was out of Gonzales, Texas and booked for

a dangerous game hunt.  Hanshew has been emailing and contacting Plaintiffs' clients asking them

if they had any problems with their hunts with Plaintiffs.   Plaintiff believes Hanshew covertly

obtained Plaintiffs' list of clients. Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke

and DSC place unlawful restraints on the trade and commerce in offering Zimbabwean African

hunting safaris between several states and territories of the United States.   Based upon Buzz

Charlton's retraction, DSC is on notice that the allegations of the individual designated Defendants

are false.

16.  Defendant, Jerome Phillipe Frederic Lung and Africa Hunting, LLC has a moderated website,

africahunting.com.  Each post must be approved by Lung clarifying or contradicting posts by

Plaintiffs or others were not allowed to be posted.  Lung approved and participated in his moderated

website, africahunting.com to post various information on Plaintiffs.  Lung alleges that Plaintiffs are

not allowed to exhibit at SCI and he re-posts other defendants' blogs and emails alleging that "per

decision of SCI show management, Impala African Safaris under ownership of Arnold Payne, is

currently not accepted to exhibit at any future SCI shows.  Future actions regarding official company

and/or individual suspension will be determined pending current ethics investigation."  Lung and

Africa Hunting posted additional language such as "Update: Impala African Safaris Arnold Payne

not allowed to exhibit at SCI."   The africahunting.com moderated website was used by other

defendants such as Michael Burke by the blog name of Mike70560  to state,  "Arnold Payne, Tiki

and Ken Drummond are marketing hunts on Savuli, which was illegally taken over by Shuvai

Mahofa from Terry Anders and others."  Burke later posts on Africahunting.com on March 23, 2013,

"The fact is Arnold was selling hunts on Savuli (in the SAVE Conservancy) immediately after Terry

Anders was forced off the property.  I saw this on his website.  He is no longer offering these hunts

on his site, I am not sure if he offers them at all now.  It was also documented in the SW Radio

article link I posted.  Without a doubt he was selling these hunts.  I am sure the clients that hunted

Savuli had excellent hunts.  I have hunted up to the Savuli property line and there was very good

game in the area.  It is not about the quality of the hunts, it  is about how the hunting rights were

obtained and taking advantage of a bad situation.  Ken Drummond played a hand in forcing rightful

owners off their property in the SAVE and the takeover of the hunting.  I know several players that

were involved and I can assure you they are no longer hunting Savuli.  This was also documented

in the article I mentioned.  Ken Drummond is very politically connected in Zimbabwe.  As a Zimbo,

you  do  not  want  to  cross  him."   Lung  frequently  refers  to  Black  Africans  on  his  website,

africahunting.com, as "cockroaches".


17.  Lung, Africa Hunting, Pietrangelo and Shores have assisted and re-posted Burke's blogs and

emails fraudulently alleging that Plaintiffs are involved in illegal hunts and taking land illegally away

from Savuli owners and operators in the SAVE Conservancy.  Shores repeated the false allegations

to a board member of SCI, Laird Hamberlin, insisting that SCI refuse Plaintiffs a trade show booth

and membership.  Once Shores got Plaintiffs out of SCI, he hoped DSC would follow.  Shores

posted these private emails onto www.accuratereloading.com to reach a greater audience.   In reference to Plaintiffs, Lung and Africa Hunting posts themselves and re-posts others' blogs asking people to "put Payne out of business."   Lung and Africa Hunting have re-posted Burke's blogs stating "It is not looking good for the legal and rightful owners of the SAVE.   Anybody hunting on stolen property should be tied to a tree for lion bait.   Same goes for the property stolen from the rightful owners." [2]   Campbell  covertly used his uncle's computer and email account to disseminate "altered" documents from Mike Wirth, an employee in charge of trade shows in Phoenix at SCI who does not serve on their ethics committee, to disparage Plaintiffs.   Ethics complaints are handled out of the Washington D.C. Safari International office, not the Tucson office.   This breach of protocol at SCI is unusual since prior Vice Presidents of SCI have been removed from office for disclosing such information and shows malice.    Lung and Africa Hunting re-posts Burke's blogs stating that he can not understand how Plaintiffs can attend the DSC Trade Show.   There is a 75% overlap of members between DSC and SCI.   The two organizations work hand in hand and participate in joint marketing campaigns on events and spokespersons such as "Big Buck Down" featuring Ivan Carter.  A national spokesman for DSC was in a nationally broadcast SCI advertisement in August 2013. Lung and Africa Hunting blogs that he does not understand how Plaintiffs can market their "illegal hunts" in the United States without being prosecuted here.   By November 2012, such fraudulent statements by Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell had resulted in death threats to Plaintiffs' employees at the Bulawayo airport by racist thugs.   In a letter

---

[2]  This language sounds disturbingly similar to KKK calls for lynching and highlights the racial overtones of this case.  We have received confirmation from counsel for SCI, Ronald Stolkin, which confirms the Gene Campbell email disseminating an alleged email from Mike Wirth, SCI Exhibit Program Manager was an "altered" document and that in fact SCI has not "kicked out" Payne from SCI and he is in fact a "member in good standing."

First Amended Complaint                                                                                        10

dated April 3, 2013, SCI informed Plaintiffs that their trade show booth application for the 2014 annual SCI convention had not been accepted and their deposit was being returned.   There are no ethics complaints against Plaintiffs or an ethics examination on the Plaintiffs at SCI .   In fact, by August 16, 2013, the various chapters of  SCI have been asking Plaintiffs for donations of hunts for fund raising activity.

18.  The SAVE is almost all tribal land which is owned by tribes and not individuals.  The land is leased with concessions and when the leases are not renewed, the concessions are taken back by the tribal owners.  When the leases are not renewed, the lessees such as Terri Anders move off the land and the tribal lessors re-lease the concessions.  Payne is not a Chief.  Payne does not have any involvement at all in the SAVE.  The SAVE was previously a private concession which now pursuant to National policies has a complete partnership with Chiefs, villages, tribal rural communities, Government Parks management involvement.  Terry Anders was already working with new leaseholders in the SAVE.  Plaintiffs' outfitter,  Drummond was asked to step in as he speaks fluent Shona to iron out and mediate a disagreement between local Chiefs, villagers, tribal rural councilors, white operator and black leaseholder.  Ken Drummonds tried to get the new leaseholders to pay Anders for improvements or lease it back to Anders.  Anders did not or could not pay the current market rates and had to go.  The end result was that South Africans became the new lessees which is typical in most African countries.

19.  Plaintiffs' family was not associated with any of these policies and they even had  their farm seized in a re-distribution program.  Historically, under the old Rhodesian Land Husbandary Act of

Salisbury, no farmable land in Zimbabwe could be owned by either colored or blacks and a white could move on the land, fence it and claim ownership. The blacks were paid nominal amounts to work the land making them in effect slaves. Until 1905 no whites owned any land in Zimbabwe. By 1950 no blacks owned any land in Zimbabwe. In 1969 Rhodesia rebelled against the British Crown and declared their independence to keep blacks and coloreds form voting and instituted harsh segregation laws. Around 1972 the latest revolution began. After 2008, certain lands were seized from white owners and re-distributed to black "veterans" who were connected to the government. This redistribution of land in some parts of the SAVE did not take place in Savuli.

20. The false allegations of Lung, Burke, Hanshew, Pietrangelo, Campbell and Shores are that Plaintiffs ran landowners off the Savuli Ranch at gunpoint, sold illegal hunts to the Savuli Ranch, and partnered with a proscribed member of the Zimbabwe government to illegally acquire land concessions on the Savuli Ranch. At the core of these false allegations is racism and racial profiling. Payne is a successful Zimbabwean and entrepreneur with an outstanding work ethic who built a very successful business in the United States. Defendants assume Payne is involved with land seizures and corrupt Zimbabwe government because no one of mixed heritage in their world can be successful without theft and corruption. Racism is involved because the actual operators who sell hunts on the Savuli are Frans Troskie of Sitatunga Safaris (\www.sitatungasafaris.com) and Chris Troskie of Chris Troskie Safaris (www.ct-safaris.com) , both are exhibitors and members of the DSC. Why does DSC ban Plaintiffs from allegedly doing business in the Savuli and allow the Troskies, because they are white and Payne is "colored". Such rumors abound even though Payne has never set foot on the Savuli Ranch or booked a hunt there. The allegations against Payne are

offensive.  Payne's Uncle ran as an independent candidate against all the political parties in multiple elections in Zimbabwe.  Payne's father is a Baptist minister and missionary.  Payne's father and all three of his uncles were in the Rhodesian army and saw combat in the Rhodesian War.  In 1992, Payne's uncle and namesake, Arnold Payne, when he was 74 years old was the subject of a BBC documentary televised worldwide on his vision for Matabeleland to be transformed by channeling water from the Zambezi River to the tribal people of Matabele. Payne is a graduate with a B.S. of Science Ag. Economics from the University of Kentucky and he qualified for the Zimbabwe 1996 and 2000 Olympics in the 400 meter dash.  Payne competed professionally on the European Grand Prix Track & Field circuit representing Zimbabwe from 1999-2004.  Payne and his family are legal, law abiding citizens of Zimbabwe conducting legal businesses. Plaintiffs are the representative of one of the largest shares of Dangerous Game quota in Zimbabwe.   The smallest property that Plaintiff conducts safaris is on 120,000 acres, arguably Africa's best quota.   Plaintiffs have concessions of various sizes with the biggest concession being over 3 million acres with superb quotas.  The land the Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell accuse Plaintiff of invading is 14,000 acres.

21.     Lung and Africa Hunting operate a moderated website africahunting.com.  Through his outfitting business Lung competes with Plaintiffs.  Lung's father, Ozondjahe operates competing hunting safaris in Namibia under the website known as namibianhuntingsafaris.com.  Lung and Africa Hunting's marketing approach is to make fraudulent false statements on the Internet and hunting forums through emails and blogs to keep Plaintiffs out of the trade shows and run him out of business.

22.  The dominant market share of African hunters worldwide is the Texas market.  DSC has 40,000 attendees which is more than SCI has in their annual conventions and all of their worldwide shows.  The majority of clients are derived from the Texas market which Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and DSC  hope to affect by narrowing down the market and choices of safari operators in the Zimbabwe market place.  Eliminating Plaintiffs from the DSC show drastically reduces competitive pricing and significantly drives up the costs for hunters hunting in Zimbabwe.  For a variety of reasons,  Mozambique, South Africa, Namibia, Botswana, Zambia are not viable alternatives for low fence and no fence big five wild game hunting in Africa.   A few outfitters offering their own hunts for Zimbabwe  however these outfitters engage in illegal price fixing establishing a standardized trophy fee and day rates where there is little variance in the price.  Plaintiffs offer Zimbabwe at steep discounts benefitting the consumer.   In an effort to raise prices and limit consumer choices, Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and DSC have attempted to eliminate Plaintiffs' access to the most important dominant market in the world.

23.  Plaintiffs donated a hunt to charity for SCI.  Pietrangelo, Campbell and Hanshew contacted the successful bidder and he backed out of the hunt.  Later the successful bidder did his own research and decided to go on the hunt to his satisfaction.  This is an example of the campaign to disparage Plaintiffs.

24.  Hanshew booked a hunt with Plaintiff in 2008.  Zimbabwe was in a monetary crises and there were shortages of all major commodities including food and most particularly petrol.

Defendant Hanshew found out his Professional Hunter then assigned was an indigenous African, Col. Tsheba, he tried to get out of his contract with Plaintiff.  Plaintiff refused to release him.

25.  Plaintiff was merely the booking agent, and the actual Professional Hunter was Col. Tesheba.  Plaintiffs do not, nor have they ever guaranteed that a hunter will get every animal he seeks on a hunt.  Sometimes you are successful and sometimes you are not, and every hunter should know this.

26.  Hanshew in all regards had an excellent hunt, even given the difficult times Zimbabwe was at that time suffering.  Except for Hanshew's poor shooting skills he would have taken a cape buffalo.  Instead Hanshew shot at and missed a Cape Buffalo, and because Hanshew is a poor shooter began to blame Plaintiff for not getting a buffalo. After the hunt Hanshew had trouble getting his trophies back, however Plaintiffs though they diligently tried to intercede, could not get the professional hunter to do the paperwork.  On best belief Hanshew had made racist remarks to his black African indigenous outfitter's son, the professional hunter and offended the outfitter to the point he wanted nothing to do with Defendant.  Plaintiffs agree that it should not have impacted the professional hunter completing his paperwork.

27.  The professional hunter had an excellent reputation in Zimbabwe and this is the only known instance of their being a problem.  However, all parties agree, Plaintiff and Hanshew that the paperwork for getting Hanshew's trophies back were not properly handled in Africa.  Hanshew operates a moderated website www.westernexpedtion.com.

28.  A dispute with Hanshew then developed over the missed buffalo.  Plaintiffs' position  and

industry standard is that if you have an opportunity at an animal, he has filled his obligation. [3]

29.  Hanshew recently tortiously interfered with a signed contract with Dr. Lyons resulting in him

canceling a $45,000 elephant hunt.  Hanshew defamed Plaintiffs to Dr. Lyons including casting

dispersions on Payne's daughter, invading Payne's family privacy to cast dispersions on Payne.

30.  Further Hanshew on or about November 2012 told Dr. Lyons several false statements

including Arnold Payne was under ethics investigation by SCI, Payne was soon to be kicked out

of SCI, and that Payne had numerous lawsuits and judgments.

31.  Hanshew further contacted Barbara Crown, Editor of the Hunting Report.  Dr. Lyons had

also contacted Barbara Crown as Dr. Lyons had become so concerned regarding his deposit he

wanted to rescind his legal contract.   Barbara Crown contacted a Life Member of DSC to talk to

Plaintiff at the January 2013 Dallas Safar Club to refund Dr. Lyons money.  The conversations

with Barbara Crown, involved the defamation of Arnold Payne at the DSC, including mentioning

there was a rumor circulating that Arnold Payne was soon to be kicked out of SCI.

32.  A life member of DSC, talked to Plaintiff in January 2013 at the DSC about securing a

---

[3]  Hanshew feels that he should have multiple chances to get a buffalo regardless of his poor shooting.
Hanshew took the matter to small claims court and was only awarded the difference between the dangerous game
daily fee rate and the plains game rate, a nominal amount of money of a few thousand dollars.  Plaintiff  although
disagreeing with the findings of the court paid said award and moved forward.  Hanshew then began a campaign of
stalking Plaintiff.

donation for his chapter of SCI in Texas.  This person  was later informed of Hanshew's derogatory statements  regarding multiple judgments against Payne and pending SCI ethics investigation.

33.  After a Texas SCI Chapter published a description of  Plaintiffs' hunt, a person who is life member of DSC, President of a Texas SCI chapter began to get multiple email and phone call contacts related to Defendant's Hanshew's multiple post and emails which stated that Plaintiffs were under ethics investigation and soon to be kicked out of SCI.

34.  On or about May 13th 2011  Plaintiffs sent out an advertisement via email of his various hunt specials.  Included in the CC was a list of his then current clients.  Hanshew acquired this list even though he was not emailed, and began emailing all of Plaintiff's clients describing his experiences with Plaintiff. He invited the recipients of his emails to call him.  In these numerous phone calls with many Texas residents Hanshew again falsely stated  that Plaintiff was soon to be kicked out of SCI and further that he had multiple judgments against him.  The recipient of one of these poisoned defamatory emails was a Jason Sayco, a Texas resident.

35.  Hanshew told Jason Sayco that Plaintiff was being kicked out of SCI and would go out of business and lose all of his money.  Hanshew then had a conversation with a board member of a Texas SCI chapter encouraging him to drop Plaintiff from their donations because he was eminently going to be kicked out of SCI and was under a SCI ethics investigation.   A member of SCI cannot do business with anyone kicked out of SCI for an ethics violation as part of their

bylaws.

36.  A DSC member and an SCI officer called Hanshew in October 2012.   Hanshew represented

he was "high up in SCI" and Plaintiff was soon to be kicked out of SCI.  Hanshew represented

that Plaintiff had been caught selling illegal hunts and if anyone hunted with Plaintiff they would

be guilty of violating the Lacey Act and probably would be committing a felony.  Hanshew

encouraged the officer to sever all ties with Plaintiff.

37.  In November 2012, Campbell contacted Hanshew.  Hanshew laid out a game plan for

Campbell and gave Campbell the addresses and contact persons at DSC.  Campbell was told that

he could get Plaintiff kicked out of DSC if he filed a complaint as there was already an ongoing

ethics investigation in SCI against Plaintiff.   Campbell then contacted Plaintiff and wanted his

bill of $18,000 written off and further demanded Plaintiff "give him a free buffalo hunt".  If his

demands were not met Campbell represented he had talked to Hanshew and because he was a

former charter boat captain knew how to "ruin" plaintiff.

38.  Plaintiff refused the extortion demand Campbell then sent a letter to DSC grossly lying about

the facts of his hunt and falsely defaming Plaintiff.  An officer of DSC had a previous association

with Hanshew and this defamatory along with the fraudulently doctored letter allegedly from SCI

were used in part as a pretext  to bar Plaintiff from their DSC show.

39.  Shores videos are for sale on the Internet promoting Plaintiffs'  competitors and various

other hunting associations such as Cal Pappas's African Hunter magazine the Corpus Christi,

Texas operator, John Barth and a rival outfitter in Zimbabwe called Zambezi Hunters for

compensation, hunting discounts and allowances.

40.  Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and DSC violated

the provisions of the Sherman Act, 15 U.S.C.A.  §§ 1 et seq., and the Clayton Act, 15 U.S.C.A.

§ 15, in that they are engaged in a  conspiracy to place unlawful restraints on the trade and

commerce of offering Zimbabwean African hunting safaris between several states and territories

of the United States.

41.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores, and Campbell collectively

made false statements in public, in correspondence, email, by telephone, blogs and on the

Internet pertaining to the Plaintiffs and their business.  Such false statements include but are not

limited to:

      a.     Lung, Africa Hunting, Pietrangelo, Hanshew falsely claimed Plaintiffs

          were "Booking unethical and illegal hunts at Savuli".  Specifically,

          Pietrangelo posted an email to Hanshew on September 9, 2012 stating,

          "I'm not sure if you are aware of the travesty that is occurring in the SAVE

          Conservancy. . . . I was hoping we could come up with a plan to end his

          operation. . . . It just sickens me.  This guy is not nice, from what I've read,

          he and his partners need to be exposed so no other client is mislead."  In

          later posts on DSC's facebook page, Pietrangelo stated, "Has anything

been done regarding Savuli I hope the thieves that are running it got washed-away in a flood."   These posts have led to numerous death threats to Plaintiffs' employees. Plaintiff has not booked any illegal or unethical hunts at Savuli or any illegal hunts anywhere.

b.      Lung and Africa Hunting falsely represent on their moderated website that Plaintiffs that "Arnold Payne, Ken Drummond, Tikki Drummond, Impala Safaris and any agent thereof is acting completely and utterly illegally with respect to any and all of their actions on Savuli and within the Save Conservancy.  This is not a legal opinion, it is the Opinion of the High Court of Zimbabwe as set down in their recent judgment."   There is no judgment alleging that Plaintiffs have done anything illegal.  All of the Plaintiffs' hunting activities are legal.

c.      Shores falsely claimed Plaintiffs were "in with some of the Zim ministers that seized the property in the Save (Save Valley Conservancy) plus some other bad characters".

d.      Lung, Africa Hunting, Pietrangelo, Hanshew, Burke and Shores falsely claimed that Plaintiffs were "selling hunts for some that are on the banned list".  [4]

e.      Shores falsely claimed Plaintiffs were "advertising a quota of 5 lions on Savuli.  Savuli has only 14,000 acres."

f.      Campbell, Hanshew, and Shores falsely claimed Plaintiff "has been sued

---

[4]  Plaintiffs have never dealt with a single individual or anyone on a banned list.

and lost repeatedly".

g.      Shores falsely claimed Plaintiffs were "bad for hunting, bad for Zim

(Zimbabwe) and bad for SCI".

h.      Lung, Africa Hunting, Pietrangelo, Hanshew and Shores falsely represent

that Plaintiffs have been accused of evicting people at gunpoint.

i.      Lung and Africa Hunting, Shores, Burke and Pietrangelo falsely represent

that Plaintiffs have been accused of illegal land invasions.  Plaintiff have

never invaded any land or any territory in Zimbabwe.  Plaintiffs have

never taken any land in Zimbabwe.

j.       Lung and Africa Hunting falsely represent on their moderated website that

Plaintiffs are involved with Shuvai Mahofa, stating    "Shuvai Mahofa has

taken over the Savuli Ranch in the Save Valley Conservancy.  She claims

that she has a legal lease on the property issued by the department of

National Parks (who are not entitled to issue leases on Conservancy

Properties), however the High Court of Zimbabwe has ruled, in a number

of decisions that the legal owners and operators of Savuli, namely Forever

African Safaris, should continue operations on Savuli and that their

operations should not be interfered with.  In contempt of these High Court

decisions, Mahofa has evicted Forever African and its employees, trashed

their belongings and thrown their furniture out on the road.  In the

meantime, Mr. Ken Drummond has moved onto the property and is

operating as Impala Safaris on the Property.  They are operating on a quota

issued to Mahofa which has 5 lions on it.  This in itself is farcical as this is more than the entire Save Conservancy quota and Savuli forms a tiny part of this.  The issue of the quota itself is also in contempt of a High Court determination that names Forever African as the rightful operator.  Given that National Parks are withholding quotas from white operators in the Save, the handing of ridiculously high quota to an illegal operator is inexplicable and smacks of a complete disrespect for the rule of law from the upper echelons of Parks and indeed the Ministry itself." [5] Plaintiffs do not operate or outfit any safaris other than quota purchased on Bubiana and Zambezi valley i.e. purchasing quotas with partners as an outfitter. Plaintiffs are booking agents and do not operate on any Savuli Valley property.   Plaintiffs have never sold a hunt in the Savuli and have never set foot on that property.

k.    Lung and Africa Hunting falsely represent on their moderated website that Plaintiffs are involved with Mahofa, stating "It has long been suspected that Drummond has paid Mahofa to act in his interest and secure a ranch in the SAVE Valley, however the fact that he is now posting pictures of the Savuli camp and several impressive trophies on the website of Impala Safaris . . .which is owned and run by one Arnold Payne."  It is a United States felony to do business with someone on the Proscribed list. Pursuant

---

[5]  The fact defendant stresses "white operators" shows the racists overtone of these posts. The issue is not who is best qualified to hunt in the SAVE but rather keeping the SAVE white only in a country where whites represent only 1% of the population.

to Executive Orders, Statutes, Rules and Regulations Relating to the

Zimbabwe Sanctions, Executive Orders 13469, 13391 and 13288 under

Section 541.701, the penalties are up to $1,000,000 fine and up to 20 years

or both.  Plaintiffs do not know anyone named Mahofa and does not have

an affiliation with anyone known as Mahofa.

42.  The statute of limitations for disparagement is tolled based upon the continuous wrongful

acts and the discovery rule.  Under the discovery rule, the limitation period starts running from

the date the injury is actually discovered or the date when the injury should have been discovered

if the plaintiff had exercised reasonable diligence, whichever is earlier.  Plaintiffs allege  that

they did not know about the disparaging comments and the extent of the comments since they

were placed covertly on the Internet and Plaintiffs did not see them or become aware of them

until clients began commenting on them.  In addition to the discovery rule, the fact that the

tortious claims are tied to a civil rights violation, the limitations period does not run.

43.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, ,Shores, and Cambell have

implemented several techniques to circulate their false statements.  Such activities include:

    a.    Lung, Africa Hunting, Hanshew have been designing and marking key words in

    their moderated websites, otherwise known as search engine optimization,  to

    obtain priority search results on various Internet search engines such as Google

    when someone types in Plaintiff's names to headline their disparaging statements.

    b.    Campbell and Pietrangelo hacked into Plaintiffs' email accounts and

circulated emails to Plaintiff's customers, on best belief.

c.     Lung and Africa Hunting, Shores, Pietrangelo, Campbell have been posting disparaging remarks on various blogs to circulate the false information.

d.     Lung, Africa Hunting, Pietrangelo, Shores, Campbell, and Hanshew have made false statements have been posted on hunting forums such as www.Africahunting.com, www.AccurateReloading.com and www.24HourCampfire.com.  For instance, the postings on Africahunting.com titled "Legal judgment against Impala African Safaris and Arnold Payne" (Hanshew's post), on May 1, 2013, Lung posted a link to the thread that states Arnold Payne is not allowed to exhibit at SCI.

e.     Lung and Africa Hunting, and Pietrangelo have circulated false statements through email lists to various hunt magazines such as "Sports Afield" and hunt organizations such as the DSC, Houston Safari Club and SCI.

f.     Hanshew and Pietrangelo have sent false statements directly to Plaintiffs' clients from what appear to be hacking into Plaintiffs' confidential, trade secret email lists of clients and business prospects.

g.     Pietrangelo posted false statements on the Facebook page of the DSC.

h.     Pieters made false statements on certain radio stations in Southern Africa (SW Radio).

i.     Ben Carter, and Chris Hudson of DSC, Pieters, Burke, Campbell,

First Amended Complaint                                                                24

Pietrangelo, Shores and Hanshew have made false statements to members

of the ZPHGA telling potential hunters not to hunt with Plaintiffs.

j.    At trade shows Plaintiffs have been advised by their own clients that

hunters who have hunted with other Zimbabwe hunt companies have

verbally told Plaintiffs' hunters not to hunt with Plaintiffs.  Such false

information came from Lung and Africa Hunting, Shores, Pietrangelo, and

Pieters.

.    k.    Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores, and

Campbell through business websites operated by these designated

Defendants have posted derogatory false statements about the Plaintiffs on

such websites as africahunting.com, LinkedIn, DSC's facebook page,

Western Expedition, accuratereloading, and 24hourcampfire.


## ANTITRUST VIOLATION - RESTRAINT OF TRADE

44.  Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and DSC are

engaged in illegal restraint of trade through  ZPHGA, and/or at their direction, this restraint of

trade is directed both commercially against Arnold Payne and his business Impala Safaris and is

based on prohibited illegal race discrimination. The long history of white racism and suppression

of the 99% majority population in the former Rhodesia is a matter of public record. The dark

under belly of continuing "white only" repression is rarely publicized, particularly in the hunting

community.  Whites make up less than 1% of the total population in Zimbabwe, but Whites

make up more than 80% of Zimbabwe's upper class.

First Amended Complaint                                                                              25

45.   A DSC member who has generally strong positive feelings towards the DSC will not take African American friends to DSC because of how they will be treated.

46.   A member has been to roughly six DSC shows in the last eight years and in this time has seen many tens of thousands of Anglos at the event and can remember less than 10 – 20 African Americans attending the show as members of the public.

47.   The DSC Convention is held in a place of public accommodation at the Dallas Convention Center.  The only African Americans at the DSC are working in menial positions as security guards, janitors or food handlers.  African Americans are so rare at the DSC, that a DSC member witnessed a white attendee asking an African American attendee if he could get him a drink as they were standing in the cocktail area.  He assumed the individual was a server since he was African American.

48.   The DSC has volunteers that run the convention, and they are on the floor wearing special vest designating them as DSC authority figures. When problems arise you contact one of these DSC individuals in vest. The DSC member with a friend approached one of these vested DSC convention administrators in January  2013. When the friend asked the vested Dallas convention volunteer how things were going, the vested Dallas convention administrator responded "well we're keeping the N_____ out". The DSC member did not know if it was a private joke or in what context the statement was made: keeping African exhibitors out, keeping transients out of the hall that happened to be African American, or keeping liberals out of the DSC.

49.  In 2012 Dallas County was 22.9 % African American and 32.2 % non Hispanic white per the

U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates,

American Community Survey, Census of Population and Housing, State and County Housing

Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of

Business Owners, Building Permit.


50.  In the period of time a DSC member attended, at least 50,000 people attended over the last

several years, yet the African American attendees were less than 20, probably less than 10.

During the history of the DSC no president, executive director or Board of Director has been

African American although 22.9% of the county is African American. Even though only 32.2%

of Dallas County is white, virtually all the DSC attendees are Anglo.  When a Dallas Safari Club

member was hunting in Zimbabwe, he overheard R. M. a Zimbabwean of European Ancestry,

state that he was an officer of the ZPHGA.  R. M. stated that the ZPHGA was trying to keep the

blacks out of the hunting business and it has been hard.   R. M. gave the example that they had

tried to make the written test so hard no black could pass it. The last season a black had passed it

with 100% score. The DSC member asked R. M. if the black knew hunting what was the

problem with him being a professional hunter.  R. M. responded that the black was dumb as a

brick, he was a parrot that could learn the answers but was not smart enough to be a professional

hunter. The ZPHGA had decided to redesign the test so this could not happen again.   The DSC

member traveled to Zimbabwe a second time and found out in fact the ZPHGA had changed their

testing methods.   The DSC member talked to a Zimbabwe professional hunting outfit at DSC

that said he should not hunt with Payne because he was Colored and they would be hunting with

native Africans if they used his company.

51.  When a Dallas Safari Club member was arrested in South Africa associated with the

infamous Dawie Groenwald for rhino poaching, it made international news.  No DSC board

member took personal interest to call individuals and follow up, even though the DSC member

was arrested, and tried for rhino poaching – while this was pending he was still allowed to show

and sell hunts at DSC.


52.  Anti-discrimination laws apply to the Dallas Safari Club because it is a place of exhibition as

defined by the law.  The Dallas Safari Club is held annually in January at the Dallas Convention

Center in Downtown Dallas.


53.  Dallas Safari Club falls squarely under the rules related to a place of public "exhibition"

(quoting the statute) and further DSC calls its attendees "exhibitors".

The Convention Center is attached to a hotel, a place of "public accommodation" and the Dallas

Safari Club even advertise preferential rates and it is the preferred hotel for exhibitors with the

nightly events held for DSC at the hotel.  Most of their officers stay at the hotel during the

convention.


54.  The Dallas Safari Club offers extensive cafeterias and lunch counters as well as many of the

exhibitors offering and beverages.  Dallas Safari Club has a number of bars offering alcoholic

beverages sited throughout the convention.  These bars and food areas are serviced by primarily

African Americans.  If you attend the Dallas Safari Club and are African American it is assumed you are either a server or janitor.

55.  The Dallas Safari Club Exhibition meets virtually every definition found under the "public accommodations" section of the civil rights act.

56.  Approximately 80% of the hunts offered from the Republic of South Africa are Afrikaners, those individuals of Dutch ancestry and typically supporters of apartheid.  Significant groups of Afrikaners have petitioned the United Nations as an oppressed minority to have their own "white only" homeland created where blacks can only enter with worker permits.  Members of this group also show are also members and show at Dallas Safari Club.

57.  While this complaint concerns Zimbabwe in the most part with its own history of racism as the former Rhodesia, a rogue nation; actions taken by members of DSC no matter their country of origin impacts on Plaintiff's claim to the extent it shows the racist practices of DSC.  The racist practices of DSC, in supporting the former Rhodesia policies that made it a world pariah, impacts directly on Plaintiff's claim.

58.  Of the Afrikaner's offering hunts at the Dallas Safari Club roughly 75% will not allow African American to purchase hunts on their properties.  While racist practices in South Africa are the Republic of South Africa's concern, participating in discrimination in the United States while attending a public exhibition in property paid for by United States tax dollars is very much

with the purview of the Civil Rights Act. Dallas Safari Club could easily end this civil rights violation by requiring all exhibitors to recognize United States civil rights law and not discriminate.  However, DSC position is each exhibitor has a right to discriminate on the basis of race if they do desire.  On best belief this is a violation of their contract with the Dallas Convention Center.

59.  Specifically, a Dallas Safari Club member has personally witnessed an African American attendee refused a hunt because of his race at the Dallas Safari Club in January of 2012.

60.  Several DSC members, January 2013, have heard numerous references using the N_ word epithet in conversation.  Since the election of President Obama a polarization has occurred.  Within the DSC the use of the epithet has risen dramatically over the last several years.  Racist toned emails are passed around among DSC members.

61.  Putting this in perspective for one DSC member they hear the epithet more in the three days of the January 2013 DSC convention than they have heard it elsewhere in all public places in the preceding five years.

62.  In one booth at the DSC 2013 convention selling gun accessories the salesman referred to an extended clip and laser  sight add on to a pistol as "N_ killers" for home protection.  The crowd standing around the seller chuckled, although several members were discomfited by the comment.

63. The famous TV personality Mark Watts ("Watts") is an African American. Watt's DVD's are for sale at DSC and has attended DSC. Watts is a former CNN news anchor. Watts is also known as an outstanding shot. A DSC member has heard within DSC racist remarks towards Watts and award winning highly successful African American. One in particular sticks to mind, "He might be a kaffir, but that N_ can shoot". Per Wikipedia "Currently in South Africa, however, the word kaffir is often used as a racial slur, applied pejoratively or offensively to African blacks"

64. The defaming language, used against Plaintiffs, in itself is so off base yet surprisingly specific, describing Plaintiff "using a gun to run off land owners", "setting their furniture on the side of the road", has "claims against him by the high court" and "offering illegal hunts" and unambiguously shows the racist origin of this campaign.

65. Plaintiff and John Barth advertise in the same DSC magazine. Both make large donations to DSC that are then sold at charity auctions giving both exposure Both hunt in the same concessions at time for the same animals and try to attract the same clients. A professional hunter who used to hunt under Barth left and now hunts under Plaintiff.

66. Barth books for, Zambezi Hunters. Shores has booked numerous hunts with Zambezi hunters. Shores promotes Barth and Zambezi Hunters while he disparages Plaintiffs with the ongoing false information on illegal hunts and illegal seizure of lands in Zimbabwe.

67.  Shores is so aware of Barth's business that he was even aware and posted on the forum accurate reloading that a potential client of Barth was going to write a check to Barth, and instead book with Plaintiff. This is a highly specific and intimate business detail substantiating that Barth and Shores communicate far more than he implied in deposition or as would be found in a casual relationship of simply being a client.

68.  Shores physically went to the Dallas Safari Club January 2013. Shores has communicated to various DSC members such as Barth, defaming Plaintiff. Shores communicated with numerous DSC members through is prolific blogging with the calculated intent to harm Plaintiffs in Dallas.

69.  Shores has not denied making the defamatory statements nor that it harmed Plaintiff in Dallas.

70.  Shores has admitted discussing Plaintiffs and the various defamatory statements at a safari convention.  After receiving this information from Shores, Barth then relayed the substance of this defamation to control individuals and officers at Dallas Safari Club again committing harm for Plaintiffs in this judicial district.

71.  Shores contacted an officer of another Safari Club, Laird Hamberlin as well as the CEO. Shores bragged about the defamation spread with reference to Plaintiff through his various blogs on www.accuratereloading.com, when he used such language in his blogs as: "He is bad for hunting, bad for Zim . . . "; "This prick Payne has been sued a lot of times and lost . . . Good Riddance"; "Lest you think Mr. Payne is not a problem, .. . Certain parties in Zim publicly

criticized Arnold and his partners.  Some THUGS came to visit.  One of the more notorious

(violent) characters was coming next if an apologies were not proffered”; . .  “SCI got rid of

Arnold Payne quickly”.   “This guy is a major problem” . These contacts spread the defamation

and had a direct impact in DSC refusing to allow Plaintiffs to show in their convention.  Calling

Plaintiff “a prick” shows malice towards Plaintiff by Shores.


72.  Shores then stated the other convention had "kicked [Plaintiff] out" he hoped DSC acts as

quickly. Plaintiffs have never been kicked out of the other organization. Shores was broadcasting

to DSC putting pressure on them, communicating with them through the blog, with the calculated

intent of harming Plaintiffs in this judicial district by blocking Plaintiffs from the SCI show.


73.  Larry Shores is an prolific blogger.   All of Shores post on www.accuraterloading.com and

re-posting on the www.huntingforum.com have a strong commercial element.  Shores is typically

recommending preferential outfitters or tearing down competitors.


74.  Shores makes high quality videos of his hunts with camera men, equipment which could cost

in the range of $6,000.00 for a hunt as found on postings on www.youtube.com trailers online.

He post YouTube trailers online to entice contact regarding his hunting activities.  These

YouTube trailers are available for download in this judicial district.   Shores’ trailer was

downloaded in this judicial district by a DSC member.

75.  Shores is gaining strength in his prolific hunter persona creating a celebrity status similar to Craig Boddington (also a victim of Shores' vicious post), Ted Nugent or Jim Shockey.  Each of these hunting celebrities have their own television show.


76.  Although we conducted a limited one hour deposition of Shores with various objections raised by counsel on the scope of the questions, Shores with his growing hunter persona reaching the status of a celebrity,  would gain million of dollars free hunts, huge promotion fees, endorsement fees and a spokesman contract typically worth over $500,000 a year.


77.  Although in deposition Shores denies selling videos, Shores' videos are sold on the Internet and his  DVD's are available to Dallas Safari Club members in this district.  As evident in Shore's deposition and immediately after being made aware of this suit he contacted his distributor and had an "eBay" type hunter's website scoured and sanitized of his multiple DVD's for sale. The ads for Shores' DVD's show a retail price of roughly $65.00 US ($49.95 Euros). These DVDs are relatively high priced compared to industry average in the hunting DVD market.


78.  Shores is an obsessive elephant hunter.  Shores' DVD entitled "Hunting Big Tuskers" is a professional commercial production showing Shores and his "top 30 safaris".


79.  Shores attack on Plaintiff went beyond defamation and crossed to the point of vitriol. He admitted under oath approaching DSC members, in particular a control person in DSC as well as taking no special steps to avoid Texas residents from reading his defamation. He repeatedly

specifically referred to SCI and DSC, and suggested they take the step of kicking Plaintiff out based specifically on his libel. He very specifically targeted his damage so the harm would be felt in the preeminent African Hunting Safari market in the world, Dallas, Texas.

80. Shores' relentless self promotion further impacts in this district by the app Hunt Geo which includes Shores' Botswana 2012 Safari. Additionally, the YouTube has trailers of his Argentine bird hunting trips, and the longer version is available by DVD. This far exceeds the investment of high quality video production or activity level of the casual hobbyist.

81. Additionally while promoting John Barth through his frequent reference on blogs, whom Shores has done business with many times, he slandered and libeled a direct competitor. He intentionally damaged Plaintiff's business specifically intending that harm to occur in Dallas Texas, thus he availed himself of the Texas market.

82. The circumstantial evidence supports the view that Shores is working for Barth and other outfitters because while attacking Plaintiff,  Shores admitted he had no direct evidence support his outrageous claims.  Shores has written nothing regarding the actual outfitters on the Savuli property, Frans Troskie of Sitatunga Safaris (\www.sitatungasafaris.com) and Chris Troskie of Chris Troskie Safaris (www.ct-safaris.com), ( both Troskies are exhibitors and members of the DSC).

83.  Shores' posting on www.accuratereloading.com were viewed by a DSC member in this judicial district. The accuratereloading website is interactive, in that residents of this judicial district exchange files upload and download into this judicial district, specifically Shores derogatory blog regarding Plaintiff.  Shores' post created interactive content in that responses to his derogatory post could be made, and Shores could then respond. There is no language on the website that limits viewing of the post by Dallas residents. Shores admitted under oath he took no steps to limit residents of this judicial district. Viewing www.accuratereloading.com resulted in multiple, sustained and repeated files being interchanged with a DSC member in this judicial district.  The Board of Directors of DSC read Shores' post on Accurate Reloading and acted on in part on these posts to affect competition. The DSC officer was already on notice through a public retraction by a Buzz Charlton, a DSC member and Zimbabwe Outfitter/competitor and in addition to an email directly from Plaintiff that the derogatory statements were not true. Shores ignoring the public retraction also shows malice.

84.  The conspiracy complained of has been in continuance existence since the summer of 2012 and has been participated in for varying periods and varying degrees by each of the designated Defendants, and also by a large number of individuals not named as Defendants.  The initial step in furtherance of the conspiracy was an organized attempt to prevent Plaintiffs from participating in trade shows and renting booths for its business.  Such activities and various measures were adopted by the DSC, Inc. as ratified by the officers, directors and members of the association, in furtherance of the conspiracy alleged.

85.  The effect of Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke and DSC's collaboration has already caused anticompetitive concerns. The Defendants' collaboration has decreased Plaintiffs' market share of the hunting trips in designated areas in Zimbabwe since several trade shows have excluded Plaintiffs.  The efforts were a concerted denial which is analogous to boycott or "blackball systems" to restrict access to trade show booths.

86.  Although the DSC membership requirements must therefore be reasonably necessary to accomplish the legitimate goals of the Association, it may not exclude or discriminate against potential members on the basis of criteria unrelated to the potential member's ability to further the objectives of the Association.  In this case, Plaintiffs are being excluded based upon race and false statements pertaining to their background, history, experience and business.  Since Plaintiffs cannot find alternative comparable trade shows to exhibit their services, then the Sherman Act mandates access.

87. Arnold Payne's business activities in Zimbabwe have been based on fair access to, and rewards from, the Wildlife and Tourism sectors. He has engaged the use of indigenous Black professional hunters, he has offered his knowledge to Black indigenous land owners which include Tribal trust lands/communal hunt areas and Rural district councils.  Plaintiffs promote sustainable utilization of Wildlife in the hands of these black indigenous populations. Zimbabwe has a 98% Black Indigenous population.  Only 1% of the Zimbabwe population is white yet the professional hunters association is almost unanimously white, creating a white,

racist monopoly.

88.  With time, management of Wildlife populations and the benefits thereof have passed more

and more into the hands of the black indigenous people of Zimbabwe in the concessions listed

above. Some stakeholders in these industries see this and Arnold Payne as a threat as he proudly

supports all conservation efforts including those indigenous efforts to conserve wildlife.  It is

against this background that the Pietrangelo, DSC, Burke, Lung, Africa Hunting and Pieters have

attempted to use race as a means to exclude Arnold Payne from doing business in Zimbabwe and

exclude him from trade shows including the DSC.

89.  Access problems are most clearly presented in this situation where denial of access to

Plaintiffs will result in a competitive disadvantage.  Such access problems are violations of both

Section 1 and Section 2 of the Sherman Act. Section 1 of the Sherman Act forbids all forms of

agreement in unreasonable restraint of trade. Section 2 of the Sherman Act forbids

monopolization, attempts to monopolize, and conspiracy to monopolize. [6]  There are only a few

outfitters offering their own hunts for Zimbabwe , however these outfitters engage in illegal price

fixing establishing a standardized trophy fee and day rates where there is little variance in the

price.  One safari club member was approached by a representative of Professional Hunters

Association of South Africa ("PHASA") in an attempt to fix prices at one particular safari club in

---

[6]  The antitrust laws – the Sherman Act, Clayton Act and Federal Trade Commission Act at the federal level, and similar laws in many states – prohibit contracts, combinations, conspiracies, and other agreements in restraint of trade, as well as monopolization and attempted monopolization.  An unlawful agreement or conspiracy can exist without any writing.  An agreement may be oral or written, formal or informal, express or implied.  Casual conversations or "off the record" remarks can provide the basis for an antitrust claim.  15 USC § 1.

Texas.  Plaintiffs offered Zimbabwe at steep discounts benefitting the consumer.  In an effort to

raise prices and limited consumer choices, Campbell, Hanshew, Pietrangelo, Lung, Africa

Hunting, Burke and DSC have attempted to eliminate Plaintiffs' access to the most important

dominant market in the world.


90.  Therefore, Campbell, Hanshew, Pietrangelo, Lung, Burke's participation in the DSC, Inc.

and their individual activities amount to an antitrust violation which restricts Plaintiffs from trade

shows sponsored by not only the DSC but other hunting clubs which share information with the

club and members.  Moreover, the DSC has violated the antitrust laws since it has made the

decisions to exclude the Plaintiffs from trade shows.  Such behavior is extraordinary in light of

the numerous prosecutions of trade associations for violations of the antitrust laws.


## CIVIL RIGHTS VIOLATION

91.  Furthermore, Pietrangelo, DSC, Burke, Lung, Africa Hunting and Pieters have violated Title

II of the Civil Rights Act of 1964 prohibits certain forms of discrimination in private associations

or organizations.  Because the issue of discrimination in private clubs rarely involves protected

property or contract rights or any state action, the public accommodations law of Title II of the

Civil Rights Act of 1964 provides a remedy to victims of discrimination by prohibiting

discrimination or segregation on the basis of race, religion, color, or national origin at places of

"public accommodation" that affect commerce. [7]

---

[7]  See 42 U.S.C. § 2000a(a) (1994) ("All persons shall be entitled to the full and equal enjoyment of the
goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, . . .
without discrimination or segregation on the ground of race, . . . ."). On its face, Title II is limited in scope because it

92.  Plaintiffs conduct legal hunts on the privately run Bubiana Conservancy, Government

Sijarira Forestry Concession, Tribal Community concessions in the Zambezi Valley along Lake

Kariba and other hunting concessions based on legal quotas.  In this case, Pietrangelo, DSC,

Burke, Lung, Africa Hunting, and Pieters have attempted to use race as a means to exclude

Arnold Payne from doing business in the United States selling hunts in Zimbabwe and exclude

him from trade shows with the DSC.  By its statutory definition, a private club is discriminatory

if its membership is inherently selective.  One of the primary reasons Arnold Payne is being

targeted in a "turf war" which is vicious among Zimbabwean outfitters is because Arnold Payne

is the sole "colored Zimbabwean" agent, outfitter, representative at any hunting show.  This does

not sit well and is virtually unacceptable with all Zimbabwean rival outfitters.


93.  The DSC is acting as an agent and proxy of the ZPHGA.  The illegal price fixing and illegal

boycotting has affected and harmed Plaintiffs' business in Dallas Texas which results in a market

that represents half of Plaintiffs' business.

94.  Within the ZPHGA, there is less than 5% Black Indigenous membership among professional

hunters.  Not a single member of the ZIAPHGA has a booth at the DSC.  Zimbabwe has a 99%

Black Indigenous population.  [8]  Not a single member of ZIAPHGA  has a booth at the DSC.

---

prohibits only discrimination by private individuals providing public accommodations that affect commerce *Daniel v. Paul,* 395 U.S. 298, 302 (1969).  Congress enacted Title II of the Civil Rights Act of 1964 to eradicate racial prejudice and discrimination by private individuals in places of public accommodation.  See 42 U.S.C. § 2000a (1994).

[8]   Title II provides an important remedy to many victims of discrimination as a result of a club's exclusionary practices by broadly defining public accommodation.   See 42 U.S.C. § 2000a(b).

Zimbabwe has a 98% Black Indigenous population.  Only 1% of the Zimbabwe population is white yet the professional hunters association is almost unanimously white, creating a white, racist monopoly.

95.  The above mentioned false statements made by Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell pertaining to the Plaintiffs and Plaintiffs' business amount to deception.  Deception means "knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact." [9]  It includes knowingly withholding "facts basic to a transaction." [10]  Consequently, deception requires two important deviations from the competitive ideal: (1) falsity is not quickly exposed in the marketplace of ideas, and (2) competition itself cannot work effectively.  Market participants do not act with full and perfect knowledge (either buyers or sellers know less than their counterpart) and enter suboptimal transactions (or forgo transactions altogether).   Deception's anticompetitive effects include the following:

- raising the search costs for consumers in choosing products; [11]

- leaving consumers who purchased the wrong or inferior product worse off;

---

[9]  Black's Law Dictionary 406 (6th ed. 1990)

[10]  Restatement (Second) of Torts § 551(2)(e) (1977).

[11]  see, e.g., Gwendolyn Bounds, What Do Labels Really Tell You? As Eco-Seals Proliferate So Do Doubts, Wall St. J., Apr. 2, 2009, at D1. This effect of deception was a concern when a competitor palmed off its goods as that of its competitors. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 160-66 (1995); see also Restatement (Third) of Unfair Competition § 2 cmt. a (1995) ("As confidence in the truth of advertising diminishes, prospective purchasers may be forced to expend additional resources ... .").

- increasing the transaction costs for honest sellers to differentiate their products and to reap the financial, reputation-related rewards associated with their desirable products; [12]

- raising rivals' costs (in having to respond to a competitor's deceptive statements);

- creating market distortions and causing a deadweight welfare loss as consumers forgo or minimize purchases;

- tipping sales to the deceptive firm, which in markets with network effects [13] can lead to the exercise of monopoly power; [14]

- increasing entry barriers for new products (whose qualities and risks cannot be quickly assessed);

- preventing some markets or services (such as standard setting) from developing;  and

---

[12]  See, e.g., Qualitex, 514 U.S. at 164

[13]  Marina Lao, Networks, Access, and "Essential Facilities": From Terminal Railroad to Microsoft, 62 SMU L. Rev. 557, 560-61 (2009) ("The defining characteristic of network industries is the increasing value of their products to users as the number of users increases, a phenomenon called 'network effects' or demand-side economies of scale"; the increased value can come directly (having more interconnections as a result of more users (e.g., telephones)) or indirectly (having more supporting complements developed for that product as the number of users increases (e.g., Windows operating system))); see also United States v. Microsoft Corp., 84 F. Supp. 2d 9, 20 (D.D.C. 1999) (discussing the "positive network effect" of Windows); Case T-201/04, Microsoft Corp. v. Comm'n, 2007 E.C.R. II-3601 (discussing the indirect network effects of streaming media players).

[14]  See, e.g., Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 313-14 (3d Cir. 2007) (discussing network effects for deception in standard-setting process).

First Amended Complaint                                                                                42

- creating "lemon" markets where dishonest dealers for goods or services drive out honest dealers, [15] thereby inhibiting innovation in these markets.

96. As a result of the conspiracy alleged, the power and influence of the DSC and Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke pertaining to the trade shows have been greatly increased, its membership has grown.  Plaintiffs' business has decreased.  As a further and direct result of this conspiracy, trade shows, interstate trade and commerce in the African hunting safaris industry is restrained and prevented in such a manner and to such an extent that Plaintiffs' business has substantially been affected and decreased.  DSC in and of itself has a dominant market position in that 40,000 attendees represent as many or as much as all the other hunting shows in the United States.  Since Plaintiff owns the largest share of dangerous game quota from Zimbabwe, eliminating his participation for being nonwhite drastically limits choice to the hunting consumer and significantly raises costs.  Because of the unique characteristics of hunting in Zimbabwe, such as free range game and animals unique to Zimbabwe, there is no suitable substitute.

97.  On or about January 2013 a long time DSC member and officer of  a chapter of an international hunting club was contacted by a member of a sub-sahara professional hunting organization in Dallas Texas.   The DSC member and chapter officer was requested to implement

---

[15]  *FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922) ("The honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument, which enables the retailer to increase his own sales of the dishonest goods, thereby lessening the market for the honest product."); George A. Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, 84 Q.J. Econ. 488, 495 (1970) (noting that the cost of dishonesty includes "loss incurred from driving legitimate business out of existence").

a series of steps.   The first was to only allow "approved" professional   hunters  of the African

professional hunters organization.  All members would not get to participate in US conventions,

only the select few chosen by the management of the association.  Further the DSC member  was

requested to implement  minimum pricing at their banquet.  Additionally they were requested to

insure no outfitter sold below specific minimums both on day fees, extra fees and certain

trophies.

98.  The representative of the hunting organization went on to suggest a variety of other

standardizations in fees and terms of donations "because the donated hunts are going too cheap

and we can't sell our hunts for enough money".   They also were going to require a kick back to

the professional hunter for the hunt.  The professional hunter representative went on to say "there

are too many professional hunters and we need to cut them back because we can't make enough

money.  We need to see the prices raised across the US and [the professional hunters association]

feels the problem is the donations are being sold too cheaply".

99.  The DSC member expressed concerns that this action sounded like a violation of price

fixing.  The professional hunter stated "we are trying to fix the prices because they are too low

and too much competition" .  In all fairness he seemed to use the term "fix" as in repair

something broken.  He also stated that "if we don't do something  the kaffirs are going to take

over".   Kaffir is an epithet used for indegenious black Africans.

100.  Several DSC members on or about August 2012 heard a presentation by general counsel of SCI Ron Stolkin who opined that entering into these exclusive arrangements would be possibly a violation of the Sherman Anti Trust Act.  DSC entered into just such exclusive agreement with the Zimbabwe Professional Hunters Association which is virtually all white except for a pitifully few token black Africans.   As many members of DSC officers and directors are in national positions in SCI they heard the opinion of SCI counsel regarding the illegality of these arrangements and entered into the exclusive arrangements with the Zimbabwe Professional Hunters Association irrespective of their racist policies.

101.  The acts on the part of Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke and DSC were in restraint of trade through an illegal collusion in an attempt to have price fixing by reason of the various prohibitions to rent trade show booths, advertise in trade association materials, disparaging remarks, libel, and slander, Plaintiffs were restricted in their trade and competition, and because of such inability to compete in the market during the period mentioned, by reason of the preceding, they have been damaged in that their business is less profitable and demand for services have drastically diminished, and the Plaintiffs have lost approximately $45,363.00 monthly.

## BUSINESS DISPARAGEMENT

102.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell published disparaging written and oral statements about Plaintiffs' business in which they allege "unethical

First Amended Complaint

and illegal hunts at Savuli" as described above.  Payne is a private individual and not a public figure.

103.  The statements were false because Plaintiffs are not involved in the illegal acquisition of land in the Save Conservancy and do not conduct unethical or illegal hunts.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell are accusing Plaintiffs of violating Executive Orders, Statutes, Rules and Regulations Relating to the Zimbabwe Sanctions, Executive Orders 13469, 13391 and 13288 under Section 541.701 (" Proscription law") and the Lacey Act, which are both felonies in the United States.

104.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell published the statement with malice in an attempt to prevent Plaintiffs access to trade shows and decrease their business activity and increase the business activity of a select group of competitors, Defendants as described above.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell published the statement without privilege.

105.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores' false statements caused injury to Plaintiffs, which resulted in the following special damages: actual damages from the loss of monthly income as previously stated, loss of business, loss of credit, expense counteracting publication, exemplary damages and legal fees.   Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

106.  The controlling senior officer of DSC( in direct competition with Plaintiff ) was aware of these truthful statements, and he and DSC continued on their reckless course of action banning Plaintiff from their show alledgedly based on defamatory statements they knew to be untrue.  By using the defamatory statements even though they were on notice of the truth of the matters DSC gave itself credible deniability that the real reason for their actions were the implementation of the racist policies of the Zimbabwe Professional Hunters Association by DSC.

## DEFAMATION

107. In addition to other counts, Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores  defamed Plaintiffs.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores  published statements on their websites, correspondence, email and blogs falsely alleging that Plaintiffs are involved in the illegal acquisition of land in the SAVE Conservancy and conduct unethical or illegal hunts.  These acts are felonies under the United States Proscription laws and the Lacey Act.  The statements are false, defamatory and made with malice as outlined in the preceding paragraphs.  With regard to the truth of the statement, Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores  were acting with actual malice.  The Plaintiffs suffered pecuniary injury.

108.  Texas Anti-SLAPP does not apply as the defamation involves commercial goods and services.  Defendants are not protected by any special privilege and Plaintiff is not a public figure.

First Amended Complaint                                                                47

**TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS AND**

**VIOLATIONS OF TEXAS BUSINESS UNFAIR PRACTICE ACT.**

109.   Plaintiffs were prepared to enter into contracts with various hunting associations such as the DSC, Inc. when one by one various associations accepted the false information and barred Plaintiffs from the trade shows, restraining their business.  DSC knew and was on notice that this information was false.  As a result of the activity, Plaintiffs are losing monthly revenue of $45,363.00.

110.  Plaintiffs have an ongoing business relationship with a number of hunting clubs and associations which facilitated participating in trade shows to attract customers.  Being black listed on false information pertaining to race, and allegations of unethical and illegal hunts struck Plaintiffs' bottom line. The designated  Defendants' actions were intentional since Pieters, DSC, Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, and Pieters were competitors who compete for customers at trade shows.  By excluding Plaintiffs from the hunting clubs and associations and their sponsored trade shows, Pieters, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell were cutting quickly and effectively into Plaintiffs' client base.  Pieters, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  conduct was tortious and unlawful under the restraint of trade laws and civil rights laws.  The Plaintiffs should recover for tortious interference from Pieters,  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell  who made fraudulent statements about the Plaintiffs to third parties and the illegal boycott prohibiting Plaintiffs from hunting clubs and associations and their

sponsored trade shows. [16]  Contracts were broken because of Pieters,  Hanshew, Pietrangelo,
Lung, Africa Hunting, Burke, Shores and Campbell's interference.


111.   Pieters, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell knew
of Plaintiffs' prospective and existing clients and prospective clients and intentionally interfered
with them.


112.   DSC's illegal boycott and use of false information to keep Plaintiffs out of hunting clubs
and associations and their sponsored trade shows were independently tortious and unlawful,
regardless of the effect those actions had on plaintiff's prospective contract and business
relationships with both current customers and prospective customers from trade shows.  Plaintiffs
suffered actual damages because the above named Defendants' interference prevented Plaintiffs
from entering into the prospective contracts and or continuing Plaintiffs' business relationship
with current clients and prospective clients from various hunting clubs and associations and their
sponsored trade shows.


113.   Pieters, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's
interference proximately caused injury to Plaintiffs, which resulted in the following damages:
lost earnings, mental anguish, injury to reputation, exemplary damages, lost benefits of contracts
with prospective clients and hunting clubs and associations and their sponsored trade shows.

---

[16]  The Plaintiffs do not have to prove the Defendants' conduct was not justified or privileged  *Wal-Mart
Stores v. Surges*, 52 S.W.3d 711, 726 (Tex.2001).

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

114. In addition to other counts, Pieters, DSC, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell  interfered with Plaintiffs' contracts with current clients who had already signed on for hunting trips and with contracts with hunting clubs and associations and their sponsored trade shows.  Many of the already agreed to trade show engagements were cancelled and deposits returned causing a substantial loss in business, reputation and revenue. To have the several years standing relationships with hunting clubs and associations and their sponsored trade shows effectively summarily terminated was financially devastating for Plaintiffs.

## MENTAL ANGUISH

115.  In addition to other counts,  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell intentionally caused Payne emotional distress and mental anguish.  The business disparagement, restraint of trade and violations of civil rights have caused Arnold Payne suffer emotional distress and mental anguish in attempting to salvage bookings, locate alternative marketing procedures for the lost trade shows, respond to emails, investigations, telephone calls addressing the false accusations  while minimizing the effects on both the business and family life and peace of mind.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's actions were hateful, intentional, deliberate, reckless and made with malice.  If the Defendants wanted to put competitive pressure on Plaintiffs, they could have spent more time and money on marketing without resorting to making outrageous false statements.  The more outrageous the statements the more inciteful they have been in spreading through the general public.

First Amended Complaint                                                                                    50

116.  In addition to the other counts,  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell  intentionally caused Arnold Payne emotional distress and mental anguish. Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's conduct in disseminating false information alleging unethical, illegal hunting activities was intentional and reckless in an attempt to restrain Plaintiff's business.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell desired to cause a loss in business and a loss in reputation to humiliate Arnold Payne.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell  knew or had reason to know the high degree of harm and deliberately proceeded to act in conscious disregard limiting Plaintiffs' access to trade shows.  Arnold Payne's emotional distress was severe which included painful emotional and mental reactions, such as embarrassment, fright, horror, grief, shame, humiliation, and worry.  Arnold Payne's reaction to this stress caused nausea, stomach disorders, headaches, difficulty sleeping and eating, stress, anxiety and depression.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  conduct was outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. [17]  Defendant's conduct in spreading false information alleging unethical and illegal hunts was intentional and reckless.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell  acted knowingly when they published the information without any investigation in an attempt to take his business by damaging his reputation.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  conduct proximately caused severe emotional distress and mental anguish to plaintiff.

---

[17] *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003).

First Amended Complaint

117.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  false information spread like wild fire on the Internet and they kept the false statements alive by adding to them periodically to make sure Plaintiffs would be excluded from more hunting associations and trade shows.  This ongoing conspiracy and continuous flow of new information in new media fueled the fire.  This situation is similar to the case between Carol Burnett and the National Enquirer in which Carol Burnett testified:

"It is disgusting, and it is a pack of lies.  I---it hurts.  It hurts, because words, once they are printed, they've got a life of their own.  Words, once spoken, have a life of their own.  How was I going to explain to my kids, my family, the people I care about?" [18]

118.   Plaintiff's severe emotional distress and mental anguish cannot be remedied by any other cause of action since  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell inflicted severe emotional distress in a manner so unusual that Arnold Payne has no other recognized means of redress.  The ongoing assault of a conspiracy campaign of false statements across an elaborate mixture of media from websites, blogs, email, etc. never let up and kept feeding itself daily with new racists overtones and allegations of unethical, illegal behavior which affected Payne's family life, business life and peace of mind.   The defamation by Hanshew was even directed at Payne's daughter to a former client, Dr. Lyons.

---

[18]   *Carol Burnett v. National Enquirer*, 144 Cal.App.3d 991(1983).

119.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  wrongful

conduct caused the following damages: mental anguish, loss of society, medical expenses, lost

earning capacity, past and future pain and suffering, and exemplary damages.


120.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  conduct

proximately caused severe emotional distress to plaintiff.  Because the intended consequences or

the risk of the designated Defendants' conduct is emotional distress, proof of the Defendants'

conduct should be sufficient to prove the foreseeability element of proximate cause. [19]

**EXEMPLARY DAMAGES**.

121.  Plaintiff's injury resulted from defendant's malice, which entitles Plaintiffs to exemplary

damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).  Lung, Africa

Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores' malice and intent was to

steer Plaintiffs' business to competitors tied to a select group of Defendants.

**INJUNCTIVE RELIEF**

122.  Plaintiffs seek injunctive relief.  Injunctive relief is proper when restraining the publication

of a defamatory statement that is essential to protect a business or other property interest

threatened by intimidation or coercion. [20]  Furthermore, injunctive relief is appropriate for the

claims under the sections on restraint on trade, violations of civil rights, and unfair business

---

[19]   *Seminole Pipeline Co. v. Broad Leaf Partners*, 979 S.W.2d 730, 755-56 (Tex.App.-Houston [14th Dist.] 1998, no pet.

[20]   *Ex parte Tucker*, 220 S.W. 75, 76 (Tex.1920)

First Amended Complaint                                                                                    53

practices and the destruction of evidence pertaining to the ongoing conspiracy to disseminate false statements alleging illegal and unethical hunts .

123.   Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores published statements by both oral communication and written communication by posting information on websites, blogs, emails and correspondence asserting as fact that Plaintiffs are involved in the illegal acquisition of land in the Save Conservancy and conduct unethical or illegal hunts. Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores are non-media defendants who intentionally published the statements to third persons in an attempt to illegally restrain Plaintiffs' business and prevent them from participating in trade shows.  Payne is not a public figure.  Furthermore, such statements by the designated Defendants continued the spread of false information as it was disseminated through the Internet by third parties who did not take time to investigate the facts which were objectively verifiable through the various proper authorities pertaining to registration, court rulings and license requirements in various hunting jurisdictions which are public information.  This action by third parties was foreseeable in light of the viciousness and explicitness of the false information.  Such allegations are so unusual, that like the worst gossip, it spreads quickly.  The designated Defendants' statements involved a private issue pertaining to Arnold Payne's race, civil rights, licenses, permits and registration of conducting business in certain jurisdictions.  The designated Defendant's statements referred to Arnold Payne by name as mentioned earlier in the pleadings pertaining to the nature of the false statements.

124.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores' statements were defamatory because they expose Arnold Payne to public hatred, contempt, ridicule, financial injury, impeaches his honesty, integrity, virtue and reputation in publishing false statements that he was personally involved in the illegal acquisition of land in the Save Conservancy and conduct unethical or illegal hunts.

125.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores'  written statements were libel per se as defined by Texas Civil Practice & Remedies Code section 73.001. The designated Defendants' statement

(A)      injured Arnold Payne's reputation and exposed him to public hatred, contempt, ridicule, or financial injury by falsely stating that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

(B)      impeached Arnold Payne's honesty, integrity, virtue, or reputation by falsely stating that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

( C )     described plaintiff's natural defects and exposed plaintiff to public hatred, ridicule, or financial injury by misrepresenting Arnold Payne's affiliation with various

individuals involved in the illegal acquisition of land in the Save Conservancy and/or individuals who conducts unethical or illegal hunts.

126.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  oral and written statements were defamatory per se under the common law.   The designated Defendants' statements

(A)      injured plaintiff in plaintiff's hunting safari booking business.  The false allegations that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts restrained his trade and moved ongoing bookings and future bookings to competitor Defendants.

(B)      falsely charged plaintiff with a crime pertaining to false statements that Arnold Payne was individually involved in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

127.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  statements were false because neither Arnold Payne nor his family members were or have ever been involved with any individuals who participated in the illegal acquisition of land in the Save Conservancy and conducts unethical or illegal hunts.

128.   Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  false statements caused injury to plaintiff, which resulted in the following damages: general damages of compensation for injury to character or reputation, injury to feelings, mental anguish, and

similar wrongs and special damages from loss of earning capacity, loss of employment and business opportunity, loss of past and future income.  Payne's mental anguish included a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and public humiliation.

129.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell's  false statements were defamatory per se, which entitles Plaintiffs to a presumption of general damages. Proof that a statement was defamatory per se is considered sufficient evidence to establish some degree of damages, and the jury is permitted to estimate the amount without additional evidence. [21]

130.  Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

## REQUEST FOR PRELIMINARY INJUNCTION

131.  Plaintiffs will likely suffer irreparable injury if Defendants are allowed to destroy their records, emails, correspondence and other evidence of false statements pertaining to the Plaintiffs and if they are not enjoined while this suit is pending from their ongoing conspiracy to disseminate false statements alleging illegal and unethical hunts thereby losing Plaintiffs' ability to participate and be a member in hunting clubs and associations and their sponsored trade shows.  It is not unusual for Defendants in similar situations to destroy records or increase their

---

[21] *Bolling v. Baker*, 671 S.W.2d 559, 569-70 (Tex.App.-San Antonio 1984, writ dism'd)

campaign efforts of disseminating false information in an attempt to prolong litigation and affect Plaintiffs' business. [22]

132.   There is no adequate remedy at law because the destruction of records will prolong the litigation and increase the costs of discovery while an ongoing campaign of destructive false statements will expand the litigation to additional third parties who accept the false information without investigation and re-publish it in a more damaging format. [23]   If we can preserve the Defendants' records, minimize the addition to the list of Defendants by stopping the flow of false information, the litigation would be more manageable and minimize the likelihood of filing similar suits against new third party defendants.

133.   There is a substantial likelihood that Plaintiffs will prevail on the merits because they have strong evidence of the outrageous false statements and the intentional acts which drive many of the Defendants to minimize Plaintiffs' business by steering the business to themselves or their contacts or customers. [24]

---

[22]   *Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011); Qingdao Taifa Grp. Co. v. United States, 581 F.3d 1375, 1379-80 (Fed. Cir. 2009)*(in an International trade case, the greater the potential harm to the plaintiff, the lesser the burden on Plaintiffs to make the required showing of likelihood of success on the merits)

[23]   *N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77 (1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89, 879 F. Supp. 719, 725 (W.D. Ky. 1995)*(The court concluded that an injunction was appropriate in a labor dispute where the parties had arbitrated a dispute, but had not yet received the final arbitration award.  .A theoretical right to recover money damages will not constitute an adequate legal remedy where difficulties in the collection of any judgment render that remedy illusory).

[24]   *Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975); Bluefield Water Ass'n v. City of Starkville, 577 F.3d 250, 252-53 (5th Cir. 2009); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 417 (4th Cir. 1999)*

134.  The harm faced by Plaintiffs outweighs the harm that would be sustained by Defendants if the preliminary injunction were granted.   The restraint of trade has a tremendous impact on Plaintiffs' business, family and peace of mind and collectively spread out over all the Defendants' businesses may have less impact on them due to the dilution in the numbers of the Defendants.

135.  Issuance of a preliminary injunction would not adversely affect the public interest. In fact the restraint of trade and violations of civil rights would decrease.   The public would be better served when false information does not adversely affect competition in the hunting safari industry. [25]

136.  Plaintiffs are willing to post a bond in the amount the Court deems appropriate and continue the bond set by the Court for the temporary restraining order.

137.  Plaintiffs asks the Court to set their application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against Defendants.

## REQUEST FOR PERMANENT INJUNCTION

---

[25]  Alliance for the Wild Rockies, 632 F.3d at 1135(an environmental group sought a preliminary injunction go enjoin a timber salvage sale); *Abbott Labs. v. Sandoz, Inc*., 544 F.3d 1341, 1362-63 (Fed. Cir. 2008)( in a patent pharmaceutical case, the court found that the public interest includes consideration of whether, by shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the attack, the incentive for discovery and development of new products is adversely affected.*; Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001)(*the probable loss of consumer goodwill for plaintiff outweighs the costs of delay of defendant not being able to sell a competing fragrance product which is labeled to confuse the consumer)

138.  Plaintiffs ask the Court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendants.

## JURY DEMAND

139.  Plaintiffs demand a jury trial and tenders the appropriate fee with this petition.

## OBJECTION TO MAGISTRATE JUDGE

140.  Plaintiffs object to a Magistrate judge hearing a trial on the merits or presiding at a jury trial.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  That the Court adjudge and decree that:

a.  Campbell, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke and DSC engaged in an unlawful contract, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

b.  Pietrangelo, DSC, Burke, Lung, Africa Hunting and Pieters have violated Title II of the Civil Rights Act of 1964 prohibits certain forms of discrimination in private associations or organizations.

c.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell published disparaging written and oral statements about Plaintiffs' business in which they allege "unethical and illegal hunts at Savuli"

d.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores defamed Plaintiffs.

e.  Pieters, DSC, Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters and Shores were competitors who tortiously interfered with Plaintiffs' business to compete for customers at trade shows.

f.  Pieters, DSC, Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell interfered with Plaintiffs' contracts with current clients who had already signed on for hunting trips and with contracts with hunting clubs and associations and their sponsored trade shows.

g.  Hanshew, Pietrangelo, Lung, Africa Hunting, Burke, Shores and Campbell intentionally caused Payne emotional distress and mental anguish.

h.  Lung, Africa Hunting, Burke, Hanshew, Pietrangelo, Pieters, Campbell and Shores' malice and intent was to steer Plaintiffs' business to competitors tied to a select group of Defendants makes them liable for exemplary damages.

2.  That the Court adjudge and decree that each of the Defendants, their subsidiaries, successors, transferees, assigns, and respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from destroying evidence of their communications of false information and directly or indirectly continuing, maintaining their ongoing dissemination of false information on the Plaintiffs pertaining to allegations of illegal and unethical hunts and conspiracy alleged herein, and from engaging in disseminating such false information pertaining to a conspiracy, agreement, understanding or concert of action having a similar purpose or effect;

3.      (a)  Actual damages of $45,363 monthly beginning July 2012 through the date of judgment.

      (b)  Exemplary damages equal to three times actual damages.

      ( c )  Prejudgment and post-judgment interest as allowed by statute.

4.  The Plaintiffs recover threefold the damages that each sustained;

5.  That Plaintiffs recover the costs of the suit, including reasonable attorneys' and expert fees and costs; and that the Court grant such other, further or different relief as may be just.

Dated: October 31, 2013.

Respectfully submitted,
/s/ Dan Krocker
Dan Krocker, CPA
Attorney at Law
710 North Post Oak Road, Suite 400
Houston, Texas 77024-3812
(713) 683-0397
Fax (713) 613-2908
dankrocker55@aol.com
TBA 11728300
S.D.I.D. 3230
Attorney for Plaintiffs, Arnold Payne and Impala African Safaris, LLC

<u>Certificate of Service</u>

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the attorney for Gene Campbell, Jane Pietrangelo and Eric Hanshew; Blake Beckham, Sarita Smithee, The Beckham Group, PC, 3400 Carlisle, Suite 550, Dallas, Texas 75204, (214) 965-9300, Fax (214) 965-9301, sarita@beckham-group.com.; the attorney for William Larry Shores; Mark W. Bayer, Gardere, Wynne, Sewell LLP, 1601 Elm St., Suite 3000, Dallas, Texas 75201-4761, 214-999-4521, Fax 214-999-3521, mbayer@gardere.com, William Wilson, Holland & Knight, LLP, 200 S. Orange Ave, Suite 2600, Orlando, Florida 32801, 407-425-8500, 407-244-5288, bill.wilson@hklaw.com, ; the attorney for  Dallas Safari Club; Amy L. Rickers, Munsch Law Firm, 3800 Lincoln Plaza, 500 N. Akard St., Dallas, Texas 75201-6659, 214-880-7692, Fax 214-978-4339, arickers@munsch.com and their co-counsel, Kevin Wentz of Wentz & Zavarelli, Urban Towers, 222 W. Las Colinas Blvd., Suite 1900 N, Irving, Texas 75039, (469) 665-9105, Fax (469-665-9106, David B. Urteago, 2710 Rawlins, Suite 1050, Dallas, Tx 75219, (214) 329-0151, Fax (214) 509-7912, Attorney and Co-counsel for Plaintiffs, Philip Werner, attorney for Pieters, 1800 Bering Drive, Suite 305, Houston, Texas 77057, (713) 626-2233, Fax (713) 626-9708, pwerner@wernerayers.com, Atty for Burke, Robert Ryan Deligans, Jennifer K. Christians, David Brian Donchin, Durbin, larimore & Bialick, PC, 920 North Harvey, Oklahoma City, OK 73102, 405-235-9584,  dlb@dlb.net, Atty for Burke, Jeffrey King, Winstead, PC, 777 Main St., Suite 1100, Fort Worth, Tx 76102, 817-420-8200, October 31, 2013 by email pursuant to Doc #132, court's order on Plaintiffs' Motion for Leave to File the Amended Complaint..


/S/ Dan Krocker
_____

Dan Krocker

STATE OF ARIZONA                              §
COUNTY OF MARICOPA                            §
Before me, the undersigned notary public, on this day personally appeared Arnold Payne,
individually and as principal of Impala African Safaris, LLC, who after being duly sworn, stated
under oath, that he is the Plaintiff in this action; that he has read  the above and foregoing
instrument and that every statement contained therein is within his  personal knowledge and is
true and correct.

original signed and notarized and attached as an exhibit
Arnold Payne, individually and as principal of Impala African Safaris, LLC

SUBSCRIBED AND SWORN TO BEFORE ME on the __ day of August, 2013, to certify which
witness may hand and official seal.

_____
Notary Public in and for the State of ARIZONA

My commission expires on:_____

First Amended Complaint                                                                                  64